### IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

### CENTRAL DIVISION

| | |
|---|---|
| ADVANCED RECOVERY SYSTEMS, LLC,<br><br>        Plaintiff,<br><br>vs.<br><br>AMERICAN AGENCIES, LLC,<br><br>        Defendants. | **SEALED**<br>MEMORANDUM DECISION<br>AND ORDER<br><br>Case No.  2:13CV283DAK<br><br>Judge Dale A. Kimball |

AMERICAN AGENCIES, LLC,

        Defendant/Counterclaimant,

vs.

ADVANCED RECOVERY SYSTEMS, LLC; ET AL.,

        Plaintiff/Counterclaim Defendants.

SAJAX SOFTWARE, LLC,

        Counterclaimant,

vs.

AMERICAN AGENCIES, LLC,

        Counterclaim Defendant.

---

This matter is before the court on several motions: (1) Sajax Software, LLC's Motion for

Partial Summary Judgment on American Agencies, LLC's Claims Against Sajax Software, LLC,

Docket No. 170; (2) Sajax Software, LLC's Motion for Partial Summary Judgment on Sajax

Software, LLC's Unjust Enrichment Claim Against American Agencies, LLC, Docket No. 236;

(3) American Agencies' Motion for Summary Judgment Against Sajax's First Claim for Relief

for Breach of Contract, Docket No. 240; (4) American Agencies' Motion for Summary Judgment

on Its Eighth Claim for Relief (Violations of Utah Trade Secrets Act), Docket No. 241; (5)

American Agencies, LLC's Motion for Summary Judgment As To Claims Related to License

Agreement, Docket No. 242; and (6) Advanced Recovery Systems, LLC's Motion for Summary

Judgment on Claims for Breach of Contract and Trade Secret Misappropriation.   On September

7, 2016, the court held a hearing on the motions.   At the hearing, Advanced Recovery Systems,

LLC, was represented by Steven R. Sumsion, Kevin R. Worthy, and Amy Fiene, American

Agencies, LLC, was represented by Robert O. Rice, Michael K. Erickson, and Aaron K. Olsen,

and Sajax Software, LLC, was represented by Barnard N. Madsen and Peter Reichman.   The

court has carefully considered the materials submitted by the parties, as well as the facts and law

relevant to the motions.   Now being fully advised, the court issues the following Memorandum

Decision and Order.

## BACKGROUND

American Agencies, LLC ("AA") entered an exclusive license agreement ("License

Agreement") with Advanced Recovery Systems, LLC ("ARS"), which provided AA with an

exclusive license to use ARS' debt collection software ("ARS Software") to support AA's debt

collection business in return for a monthly fee.   While holding the exclusive license to the

software, AA incorporated its client information and other related data into the ARS Software.

Under the License Agreement, ARS was permitted to recruit independent licensees to sell

AA authorized services and to collect a commission from AA based on the revenue generated by

the ARS recruited licensees.  The License Agreement incorporated an Independent License Agreement as Addendum A.  The parties dispute whether an Independent License Agreement was actually attached as an Addendum to the License Agreement at the time the parties signed the License Agreement.

The License Agreement also provided that AA would "pay to ARS the entire License Fee collected from Independent Licensees."  Thus, AA would collect license fees from the independent licensees and forward them to ARS.

At the beginning of March 2013, AA noticed that it had not received license fees for several independent licensees.  AA's CEO Steve Kusic learned that ARS was supposedly collecting license fees from Independent Licensees who were selling or transferring their licenses in violation of the Independent Licensee Agreement, and that ARS was making changes to the agreement and entering into agreements with Independent Licensees without authority.

Because the parties dispute whether an Independent License Agreement was attached to the License Agreement as Addendum A, the parties also dispute whether there was a set agreement ARS had to use with independent licensees.  AA contends that the Independent License Agreement that had to be used was attached as Addendum A to the License Agreement. However, ARS contends that although the License Agreement refers to an Independent License Agreement attached as Addendum A, there was nothing attached when they entered into the License Agreement.  ARS takes the position that it could create its own agreements with Independent Licensees.

However, the License Agreement did not permit ARS to enter into agreements with Independent Licensees. To be an "Independent Licensee" under the terms of the License Agreement, the independent sales representative had to enter "into an agreement with AA

through the Independent License Agreement attached as Addendum A." Nowhere in the License Agreement does it provide for ARS to enter into an agreement with an Independent Licensee. Therefore, even if there was not an agreement attached as Addendum A, ARS could not determine the terms of the agreement being used with Independent Licensees, only AA could enter an agreement with an Independent Licensee.

Blake Reynold, an officer at ARS, said that ARS had collected license fees from six individuals and would forward $150,000 representing their license fee payments to AA. Because AA felt that ARS had not sufficiently explained its conduct with the Independent Licensees, AA held the $150,000 and asked ARS to provide further information about its alleged breaches. Although the License Agreement stated that it was a material breach for AA not to pay any of the required payments within the periods, or extended cure periods, provided in the Agreement, AA relied on Section 3.3 of the License Agreement, which provided that the parties were to resolve "[d]isputed, un-reconciled and/or questionable" license fee payments promptly before remitting them to ARS.

On March 20, 2013, ARS provided AA written notice of material breach pursuant to the License Agreement, specifying AA's failure to pay ARS the $150,000 in license fees. AA CEO Steve Kusic acknowledged receipt of ARS's notice of breach. Paragraph 4.13.1 of the License Agreement provides that "if the default(s) have not been cured within thirty (30) days of the receipt of such written notice of default, the non-breaching party shall have the right to terminate the Agreement and/or seek additional remedies." AA did not cure the alleged breach within thirty days.

On April 22, 2013, ARS filed the present lawsuit against AA for failure to pay or refund $150,000 to ARS. ARS also sought a declaratory judgment from the court that the License

Agreement was terminated based on AA's alleged material breach.

AA claims that it later learned that the $150,000 payment from ARS to AA did not constitute license fees collected from independent licensees, which the License Agreement required AA to forward to ARS.  Rather, ARS had entered into agreements with several independent licensees without requiring them to pay the license fee to AA.  The $150,000 was mostly raised from other sources, and AA claims that ARS' payment of that amount to AA was "simply an attempt to game the contract."

A few months after ARS instituted the present lawsuit, in June 2013, ARS was sold to Kinum without AA's knowledge.  On February 7, 2014, Kinum transferred the ARS Software to Sajax and granted "all rights and obligations in and to the AA [License] Agreement" to Sajax.  Throughout this time, AA continued to pay ARS, Kinum, and then Sajax the agreed upon $20,000 monthly fee for AA's and its clients' use of the ARS Software.  AA, however, eventually stopped paying for use of the ARS Software and notified Sajax that it no longer required access to the ARS Software for AA's clients.

AA claims that it did not pay Sajax an agreed upon amount but, rather, Sajax insisted that AA pay $20,000 per month or it would terminate AA's access to the ARS Software.  At that point, AA argues that it was aware that it no longer had an "exclusive" license agreement but the loss of the ARS Software would have crippled its business.  AA contends that it was forced to pay the amount until its business was no longer dependent on the ARS Software.

The License Agreement provided AA a right of first refusal to purchase ARS and the ARS Software.  ARS and Sajax allege that AA materially breached the License Agreement by wrongfully withholding $150,000 from ARS, resulting in ARS terminating the License Agreement on April 22, 2013.  The parties dispute whether AA's alleged breach extinguished the

5

exclusivity of its license and whether AA forfeited its right of first refusal before Sajax Software purchased the ARS Software.  AA claims that ARS gave notice of breach, but it never formally terminated the License Agreement as required under the terms of the License Agreement and Utah law.

AA added Sajax to this lawsuit that ARS had brought against it.  AA alleged that the agreement to sell ARS to Kinum and to license the ARS Software to Sajax was invalid under the License Agreement because AA had a right of first refusal.  AA also claims that Sajax tried to require it to pay $250,000 for the return of AA's proprietary client data that was in the ARS Software.  Sajax filed a counterclaim against AA for a declaratory judgment that AA's material breach forfeited any right of first refusal.

## DISCUSSION

The parties have filed several dispositive motions, many of which deal with overlapping claims and issues.  The court will address the motions based on when the motions were chronologically filed.  Therefore, the court will first address the motions between Sajax and AA and then the motions brought by AA and ARS.

### 1.  *Sajax's Motion for Partial Summary Judgment on AA's Claims Against Sajax*

Sajax argues that it is entitled to summary judgment on all of AA's claims against it because AA materially breached the License Agreement by failing to pay $150,000 to ARS and thus forfeited any right of first refusal to purchase the ARS Software.  Sajax claims that its motion is based on the unambiguous terms of the License Agreement and AA's undisputed material breach of those terms.  AA, however, disputes that it materially breached the License Agreement because the License Agreement provided that AA should retain questionable payments until the dispute was resolved.

It is undisputed that ARS made two transfers totaling $150,000 to AA and advised AA that they were "license fees" for new "Independent Licensees."  If AA entered into an Independent License Agreement ("ILA") with a new licensee, the License Agreement required AA "to pay to ARS the entire License Fee collected from Independent Licensees as stipulated in Addendum A, the Independent Licensee Agreement."  If AA failed to pay any of the payments set forth in the License Agreement within the periods set forth, or within the extended cure periods set forth, it "will be considered a material breach of this agreement."  However, "[d]isputed, un-reconciled and/or questionable amounts . . . will be resolved promptly between the parties prior to remittance."

Sajax argues that summary judgment is appropriate because AA did not pay the $150,000 to ARS and the disputed payment provision did not extend the other contraction deadlines for payment.  But the plain language of the agreement only states that the disputed amounts will be resolved promptly prior to remittance.  "Prior to remittance" does not state prior to the deadline for remittance."  In this case, AA attempted to obtain information regarding the nature and source of the funds prior to remittance and ARS' response to send AA a notice of breach.  A notice of breach is not resolving the issue promptly.  Viewed in a light most favorable to the nonmoving party, the notice of breach appears to be stonewalling.

Moreover, the plain language of the License Agreement states that AA agrees to pay ARS the entire License Fees collected from Independent Licensees as stipulated in Addendum A.  Sajax and ARS claim that there really was no Addendum A.  This provision could be read to mean that AA agreed to pay License Fees as stipulated in Addendum A.  Under this reading, if there is no Addendum A, there is no stipulation to pay ARS License Fees.  Next, without an Addendum A, the provision is ambiguous as to which party was to collect the License Fees from

Independent Licensees.  While Sajax argues that the court must read the provision to mean that AA agrees to pay ARS the License Fees either AA or ARS collects from Independent Licensees, that interpretation is not at all clear from the language.  One could easily conclude that the most likely interpretation is that AA agreed to pay ARS the License Fees AA collected from Independent Licensees.  The money at issue in this dispute is $150,000 that was undisputedly not collected by AA from Independent Licensees.  ARS allegedly collected the money from the Independent Licensees and paid it to AA in order to have AA pay the money back to it because it claimed the money was License Fees.  However, when AA disputed whether the money was, in fact, License Fees and questioned why the payments were going from Independent Licensees to ARS rather than AA, ARS did not attempt to resolve the questions.  Instead, ARS sent a notice of breach and filed this lawsuit.  By seeking to resolve the dispute regarding the nature and source of the money, AA complied with the terms of the License Agreement.

Furthermore, there is evidence demonstrating that most of the money was not License Fees from independent licensees.  Some of the money was funds raised from ARS officers.  It was not a material breach to hold on to money from an unknown origin while the parties resolved the question of why money was being given directly to ARS.  Sajax argues that even if the money was not License Fees, AA had no right to keep the money.  However, AA never asserted that it had a right to keep the money.  AA argues only that it had a right to keep the money until the disputed and questionable amounts were resolved by the parties.  The License Agreement provides that the disputed amounts should be resolved promptly.  But it is ARS, not AA, that thwarted the prompt resolution of the dispute by filing this lawsuit instead of responding to AA's questions about the source and nature of the money.

Sajax further argues that to the extent AA's claims against Sajax are based on AA's

claimed right of first refusal, which it believes is all the claims, Sajax is entitled to summary judgment on those claims.   However, the court concludes that there is no evidence that AA materially breached the License Agreement.   AA acted within its rights under the provisions of the agreement.   Therefore, AA maintained its right of first refusal under the License Agreement and summary judgment for Sajax on any claim based on that right is inappropriate.   Accordingly, Sajax's motion for summary judgment is denied.

### 2.  *Sajax's Motion for Partial Summary Judgment on Sajax's Unjust Enrichment Claim*

Sajax also seeks summary judgment on its unjust enrichment claim against AA. Beginning in February 2014, AA made $20,000 per month payments to Sajax for AA's and AA's customers' use of the ARS Software.   AA stopped paying for the use of the ARS Software in November 2014, but Sajax provided AA and its customers' access to the ARS Software in December 2014 and January 2015. Sajax seeks compensation for that time period in the amount of $34,838.71.

Sajax's services to AA were the very same software services previously performed by ARS.   Sajax purchased "all rights under the [License] Agreement" when it purchased the ARS Software from ARS.   When asked what contractual right Sajax acquired, Sajax's president Joshua Bunting mentioned the right to receive the $20,000 monthly payment from AA.   The $20,000 per month Sajax claims as the value of its services to AA is the precise amount the License Agreement between AA and ARS specified as the monthly payment for an exclusive license to the ARS Software.   Thus, the missing source for Sajax's claimed entitlement to the payment is the License Agreement itself.   But, as Sajax recognizes, a claim for unjust enrichment cannot rely on a contractual right.   Therefore, Sajax's claim legally fails.   To the extent that Sajax has a claim for the unpaid amounts for December 2014 and January 2015, it must be in the

context of a breach of contract claim and considered in light of both party's rights and obligations, and potential breaches, of the License Agreement. Accordingly, the court concludes that Sajax in not entitled to summary judgment on its unjust enrichment claim.

### 3. AA's Motion for Summary Judgment Against Sajax's Breach of Contract Claim

Sajax's breach of contract claim seeks a declaration from this court that AA materially breached the License Agreement between AA and ARS, that AA has no right to ownership of the ARS Software, and that Sajax now owns the ARS Software. As discussed above, because the court has concluded that AA did not breach the License Agreement, Sajax's claim for breach of contract fails as a matter of law. Moreover, regardless of which party first breached the License Agreement, Sajax's breach of contract claims fails because Sajax has not shown any damages. Sajax never disputes that its breach of contract claim fails to allege damages.

In the alternative, Sajax argues that if the License Agreement remains in force, Sajax, as successor to ARS, is entitled to injunctive relief to prevent AA from using the software platform to which AA migrated its data. Sajax did not plead any allegations that AA "reverse engineered" the ARS Software in its Counterclaim and cannot rest its claim on allegations of reverse engineering now. The only fact the parties appear to dispute is Sajax's assertion that its Counterclaim contains multiple allegations that AA was attempting to gain access to the source code and schema of the ARS Software for the purpose of developing a software platform with the same functionality. But Sajax cannot rely on its allegations to oppose a summary judgment. Sajax has no facts or competent evidence supporting its assertion. The record evidence shows that AA did not reverse engineer the ARS Software. Moreover, Sajax's Counterclaim does not plead any of the elements necessary to obtain a permanent injunction, and there is no record evidence supporting such elements. Because Sajax has failed to identify any evidence to support

its claim that AA is using competitive software developed in violation of paragraph 4.2, Sajax's request for injunctive relief also fails as a matter of law. Accordingly, the court grants AA's motion for summary judgment on Sajax's breach of contract claim.

### 4. AA's and ARS' Cross Motions for Summary Judgment As To Claims Related To License Agreement

AA and ARS both move for summary judgment on the claims related to the License Agreement. AA argues that ARS/Kinum's motion is untimely because it was filed six weeks after the dispositive motion deadline. In addition, AA argues that ARS/Kinum's motion is insufficient because ARS/Kinum never attempt to identify any undisputed facts that would entitle them to summary judgment. ARS/Kinum merely cites to its memorandum in opposition to AA's motion for summary judgment. The court agrees that an argument precluding AA from obtaining summary judgment is not an argument for ARS/Kinum obtaining summary judgment. However, because of the overlap of the issues raised in the two motions, the court will address both motions.

### A. ARS' Breach of Contract Claim

First, AA asserts that ARS' breach of contract claim cannot survive because it cannot show that AA breached the License Agreement. ARS' breach of contract claims asserts that AA breached the License Agreement by failing to pay "license fees" in the amount of $150,000, failing to reimburse for certain travel expenses, and failure to pay certain commissions. As discussed above, the License Agreement did not require AA to pay the disputed $150,000 to ARS. The License Agreement provides that AA would not be remit the disputed amounts to ARS until the parties resolved any disputes over the money. The withholding of payments in the event of a dispute about those payments was specifically provided for in the License Agreement.

11

Section 3.3 of the License Agreement states that "[d]isputed, un-reconciled and/or questionable amounts transacted per . . . 3.1.5 . . . will be resolved promptly between the parties prior to remittance."  Since ARS claimed the disputed amount was owed under Section 3.1.5, AA's remittance of this disputed amount was clearly subject to Section 3.3.  It is clear from the contemporaneous correspondence that the $150,000 was a disputed and questionable amount. AA acted in accordance with Section 3.3. in asking ARS to provide it with information about the origins of the money.  Rather than provide that information, ARS sent a notice of default and filed this lawsuit.  ARS did not timely respond to AA's request for further information regarding the origins of the disputed money.  ARS cannot now complain that AA did not timely make remittance of the payment.

In addition, it remains disputed whether the $150,000 ARS sent to AA constituted "license fees" collected from independent licensees.  Section 3.1.5 of the License Agreement states: "License Fees from Independent Licensees.  AA agrees to pay ARS the entire License Fees collected from Independent Licensees as stipulated in Addendum A, the Independent License Agreement."  The evidence shows that much of the $150,000 payment to AA came from ARS officers Sloan and Mitchell.  ARS cannot point to any other provision of the License Agreement obliging AA to forward payments to ARS that were not "collected from Independent Licensees."  ARS and Sajax have both failed to show that a payment made to AA was collected from Independent Licensees per the Independent Licensee Agreement, and therefore had to be paid to ARS.  Instead of bringing forth actual accounting evidence--copies of checks or affidavits of the six Independent Licensees-- to show that ARS had collected License Fees from the six Independent Licensees, ARS has brought forth self-serving and unsupported declaration testimony, an unauthentic and unexplained report from ARS' accounting software containing

12

numerous irregularities, and a single declaration from one Independent Licensee saying that he paid $5,000 of the $25,000 License Fee he agreed to in his ILA.  Based on the questionable source and origin of the money, ARS cannot show that the disputed amount triggered any contractual obligation in AA to submit the money prior to having the questions resolved. Moreover, the evidence before the court demonstrates that there remain questions as to what, if any money, should be remitted.

ARS also claims that AA breached the License Agreement in failing to pay for travel expense reimbursements.  ARS has not provided admissible evidence that it requested reimbursement of travel expenses from AA.  The License Agreement states that AA would reimburse ARS' "approved" travel expenses incurred in promoting AA.  There is no evidence that ARS' travel expenses were ever sent or shown to AA or that the travel was for promoting AA's business.  There is a signature line above "Approved" on each expense report that is empty on every one of them.  Because ARS has not identified actual unreimbursed travel expenses that it claims are unpaid under the License Agreement, the court grants AA summary judgment on this claim for breach of the License Agreement.

The evidence also demonstrates that AA fully satisfied its obligations under the License Agreement to pay commissions to ARS.  ARS specified that this claim is based on a failure "to pay any percentage fees exceeding the minimum fees for Phase One, Flat Fee Services, and ARS Processed Accounts sold to Program Clients and Net Collections under Sections 3.1.1 and 3.1.2 of the License Agreement.  However, Reynold admitted in his deposition that AA fully paid any commissions owing to ARS.  Even without this admission, ARS is unable to show from the records of sales and commissions earnings that AA has not fully paid ARS.

Even if ARS could demonstrate a genuine dispute as to any aspect of its breach of

contract claim against AA, ARS transferred all its rights under the License Agreement, including those for which it now sues, to Sajax and is no longer in a position to assert such a claim. Although ARS argues that it never intended to transfer its rights under the License Agreement to Sajax, the undisputed facts show that Kinum purchased ARS and the sales agreement between Kinum and Sajax unambiguously transferred "all rights and obligations in an to the [License] Agreement" to Sajax.  ARS now argues that this language meant to transfer "only the rights and obligations under the License Agreement which survived the termination of the License Agreement," but that is not what the plain language of the agreement states.  The agreement contains no qualifications or limits to Sajax's rights.

Also, although ARS has asserted its breach of the License Agreement claim against NRA and Kusic, neither NRA nor Kusic were parties to the License Agreement and a claim cannot sit against them.

ARS' breach of contract claim regarding the sale of AA to ARS does not survive because ARS cannot show that there was a meeting of the minds on the sale.  "Under general contract law, it is fundamental that there be a meeting of the minds as to all essential features of a contract." *Terry v. Bacon*, 2011 UT App 432, ¶ 21.  ARS claims that ARS and AA, NRA and/or Kusic entered into a contract to sell AA, but that Kusic unilaterally changed material terms of the proposed sale that were agreed upon in the original offer and acceptance.  Contrary to these assertions, however, ARS' witnesses admit that there was never a settled agreement to purchase AA.  Therefore, the court finds no basis for a breach of contract claim related to a proposed sale of AA to ARS.

**B.  ARS' Unjust Enrichment Claim**

ARS' unjust enrichment claim does not survive because it is based on its rights under the

License Agreement. "Unjust enrichment is only available as an equitable remedy where one does not exist at law." *Anapoell v. Am. Express Bus. Fin. Corp.*, 2007 WL 4270548, at *5 (D. Utah Nov. 30, 2007). ARS asserts that it and its employees conferred a benefit on AA, NRA, and/or Kusic through ARS' efforts to develop and maximize the joint business of AA and ARS. This claim fails because ARS has not presented any evidence of any benefit it conferred on AA, NRA, or Kusic not already covered by the License Agreement. *American Towers Owners Ass'n v. CCI Mech., Inc.*, 930 P.2d 1182, 1193 (Utah 1996) ("If a legal remedy is available, such as breach of an express contract, the law will not imply the equitable remedy of unjust enrichment.") Utah law does not permit the pleading of an unjust enrichment claim based on contractual obligations even where the unjust enrichment claim is pled in the alternative. *Wilcox v. Career Step*, 2010WL 624863, at *7 (D. Utah Feb. 19, 2010).

ARS claims it conferred a benefit on AA, NRA, and/or Kusic by making efforts to develop AA's business. However, the License Agreement provides compensation to ARS for making such efforts and details how the compensation is granted. Moreover, there is no evidence that ARS conferred any benefit on Kusic or NRA. Therefore, the court concludes that ARS' unjust enrichment claim fails as a matter of law.

**C. ARS' Conversion Claim**

ARS' claim for conversion also fails because it is based on a contractual right and ARS cannot show any unlawful act. Under Utah law, a conversion claim based on a contractual right cannot be maintained. *Quinn v. Nationwide Ins. Co.*, 281 F. App'x. 771, 780 (10th Cir. 2008). Under the clear terms of the License Agreement, AA had lawful justification in not paying ARS the disputed payments until the questions regarding the source and nature of the money was determined. A key element of a conversion claim is that the chattel in question be withheld

"without lawful justification." *State v. Twitchell*, 832 P.2d 866, 870 (Utah Ct. App. 1992). There is also no evidence that NRA or Kusic withheld the disputed amounts apart from the allegations that AS makes against AA. In addition, allowing ARS to maintain its conversion claim after transferring all rights under the License Agreement to Sajax would be inequitable. Recognizing a contractual right to a certain payment in one party and a right in tort based on that same contractual right to the same payment in another party would be unjust and duplicative. Therefore, ARS' conversion claim cannot be maintained.

**D. ARS' Money Had and Received Claim**

ARS' claim for money had and received cannot survive because ARS had no legal right to the disputed amount. This is yet another attempt to obtain relief for the alleged breach of the License Agreement that cannot be maintained. "In order to maintain an action for money had and received it is necessary to establish that the defendants have received money belonging to the plaintiff or to which he is in equity and good conscience entitled." *Ace Investors LLC v. Rubin*, 2009 WL 1684482, at *2 (D. Utah June 16, 2009). As discussed above, AA had a right under the agreement to hold disputed, questionable money prior to remittance. Moreover, ARS transferred its rights to payments under the License Agreement to Sajax. Therefore, ARS has no claim for money had and received.

**E. AA's Breach of Contract Claim**

AA argues that it is entitled to summary judgment on its claim for breach of contract because ARS failed to provide AA with an exclusive license and sold itself in violation of the License Agreement. The License Agreement provided AA an exclusive license to the ARS Software and a right of first refusal to purchase ARS. ARS and Sajax admit that they did not provide an exclusive software license to AA and that ARS was sold to Kinum without granting

AA a right of first refusal.  ARS violated these express terms of the License Agreement.  ARS

violated the express terms of the License Agreement by failing to maintain the exclusivity of

AA's license and by participating in its sale to Kinum and Sajax without giving AA a right of

first refusal.  ARS cannot excuse its breaches of License Agreement by alleging a prior breach by

AA.  The court has concluded that AA did not breach the License Agreement.

Moreover, ARS never provided proper notice of termination of the License Agreement.

Even if ARS had persuaded the court that the License Agreement entitled ARS to immediate

payment of the disputed amount, the facts show that the License Agreement survived at the time

ARS was sold to Kinum and then Sajax.  ARS and Sajax argue that AA's allegedly material

breach relieved them of any further obligation under the contract even as they continued to

benefit from the contract by obtaining monthly payments from AA.  ARS argues that all

payments ARS received following termination of the License Agreement were received pursuant

to a post-termination accommodation which indefinitely extended the 90-day post-termination

period set forth in Section 4.13.2 of the License Agreement, provided that AA continued to pay

ARS monthly for its use of the ARS Software.   However, the License Agreement does not state

that the License Agreement is automatically terminated upon a party's material breach.  Rather, it

states that the non-breaching party is to send a notice of breach and only 30 days after sending

that notice gains "the right to terminate the Agreement."

ARS' notice of breach to AA only provided ARS the right to terminate the agreement.

ARS never sent any later communication to AA actually exercising the right to terminate.  Under

Utah law, a party's intent to terminate a contract must be "unequivocal" and "unconditional."

*Glenn v. Reese*, 2009 UT 80, ¶ 19.  ARS argues that filing this lawsuit served as the requisite

notice to terminate the License Agreement, but it confuses the difference between performing an

act and asking whether the act has been performed.  In filing this lawsuit, ARS did not tell AA the License Agreement was terminated.  Instead, ARS asked the court to decide whether the License Agreement had been terminated by AA's allegedly material breach.

In addition to this failure to give clear notice of termination under the terms of the License Agreement, ARS' subsequent conduct to AA was ambiguous.  For two years after its filing of this lawsuit and supposed termination of the License Agreement, ARS, Kinum, and Sajax accepted and demanded that AA pay $20,000 per month for use of the ARS Software, pursuant to the License Agreement.  ARS' assertion that AA's continued payment for software services was a "post-termination accommodation" that had been arranged between ARS/Kinum and AA is contradicted by the undisputed facts.  There is no positive evidence that AA agreed to any such accommodation.  The idea that AA would have agreed to pay the same amount every month for a non-exclusive license as it had been paying under the License Agreement for an exclusive license is not credible.  In addition, the sales agreement between Kinum and Sajax stated that Sajax would retain a percentage of all payments received from AA under the AA agreement, the AA agreement being the License Agreement.  Several sources point to the parties acting as if the License Agreement was still in effect after the alleged material breach and institution of this lawsuit.  Therefore, ARS failed to clearly and unequivocally terminate the License Agreement.

ARS' breach of the right of first refusal and exclusive license provisions resulted in damages to AA.  AA was forced to continue to pay for exclusivity even after ARS continued to breach this provision.  It is undisputed that a nonexclusive license is not as valuable as an exclusive license.  ARS' expert does not dispute that at least some portion of the $20,000 per month was paid for a benefit that was not provided and thus constituted damages to AA.  ARS'

expert estimates that AA's overpayment was $115,789.47.

AA was also damaged by ARS' failure to honor AA's right of first refusal to purchase by not being allowed to purchase ARS at a price far below the undisputed market value of ARS. The measure of damages resulting from breach of a right of first refusal to purchase an asset is the difference between the market value of the asset and the purchase price of the asset. *See McGehee v. Elliott*, 849 N.E.2d 1180, 1190 (Ind. Ct. App. 2006). The Utah Supreme Court has similarly recognized that the measure of damages for breach of an option contract is the "loss of the bargain"–the difference between the market value and the option price. *Ranch Homes, Inc. v. Greater Park City Corp.*, 592 P.2d 620, 624 (Utah 1979); *see also G.G.A, Inc. v. Leventis*, 773 P.2d 841, 845 (Utah Ct. App. 1989) (difference between option contract and right of first refusal contract is simply the right of first refusal gives right to purchase if buyer decides to sell).

Sajax acquired the ARS Software from Kinum for $188,000. ARS' own expert reported and testified that ARS' earnings expectations were currently valued at $1,621,806, and set ARS' market value at that same amount. This amount, less the purchase price of $188,000 leaves $1,433,806 as the damages resulting from ARS' breach of AA's right of first refusal.

Accordingly, the court concludes that AA is entitled to summary judgment (1) on all of ARS' claims against AA, NRA Group LLC, and Steve Kusic, and (2) in its favor that ARS breached the terms of the License Agreement by failing to provide AA with an exclusive license and failing to provide AA with its right of first refusal to purchase ARS and/or the ARS Software. AA has demonstrated damages in the amount of $1,549,595.40, and the court awards AA damages in that amount.

### 5. AA's and ARS' Cross Motions for Summary Judgment on AA's UTSA Claim

Both AA and ARS seek summary judgment on AA's Utah Trade Secrets Act ("UTSA")

claim.  The issues before the court on these motions include: (1) whether ARS violated the UTSA by disclosing AA's trade secrets to Kinum; (2) whether Kinum violated the UTSA by acquiring AA's trade secrets from ARS, then using AA's trade secrets, and eventually disclosing AA's trade secrets to Sajax; and (3) whether Sajax violated the UTSA by acquiring AA's trade secrets from Kinum and then using AA's trade secrets to receive monthly payments from AA.

First, the court must determine whether AA has demonstrated that the data is a trade secret.  "Though the existence of a trade secret is a fact-intensive inquiry, it is ultimately a question of law determined by the court."  *AvidAir Helicopter Supply Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 971 (8th Cir. 2011).  The UTSA defines a trade secret as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Utah Code Ann. § 13-24-2(4).

AA's data housed in the ARS Software included types of information regularly protected as trade secrets, such as customer lists, debt information and collection efforts, data about business transactions, and specific details about AA's business methods and operations.  AA's data was not generally known or readily ascertainable by proper means by AA's competitors.  In addition, AA derives economic value from the data, which constitutes the core economic asset of AA's business.  With access to the data, competitors could gain a competitive advantage over AA.  With the exception of AA's pricing and liquidation information, Counterclaim Defendants concede that the AA data derives independent economic value from not being generally known.

Moreover, AA reasonably took several security measures to keep the data confidential

and secret.  The License Agreement required ARS to house the AA data in a password protected

database, and access to the login password was limited to select individuals who had reason for

accessing it as part of AA's business.  The License Agreement also required that ARS maintain

the AA data in a secure environment.  AA required independent sales agents to keep AA's

information confidential.  In addition, AA maintained a right of first refusal to purchase ARS and

the ARS Software if ARS wished to be acquired and to protect AA from having its data sold to

someone else.  In the case of termination of the License Agreement, the parties also had ninety

days to perform such tasks as migrating the AA data out of the ARS Software.

Counterclaim Defendants admit that the License Agreement obligated ARS to provide a

secure host site but then insist that the same agreement did not obligate ARS to keep confidential

any information placed on the ARS Software.  This position ignores their contractual obligation.

Mitchell and Reynolds only had access to the data in their positions at ARS.  Because ARS had

an obligation to keep the information secure, its officers and agents did too.  AA did not need to

have a nondisclosure agreement with each of them.  The court concludes that AA's steps to keep

its data confidential were reasonable.  Accordingly, after reviewing the relevant factors, the court

concludes that the AA data qualifies as trade secret information under the UTSA.

Therefore, the court must determine whether AA is entitled to summary judgment on its

trade secrets claims against ARS, Kinum, and Sajax.  The evidence before the court demonstrates

that ARS misappropriated AA's data by disclosing it to Kinum without AA's authorization, even

though ARS acquired the data under a duty to keep it confidential.  ARS had access to AA's

trade secret data only by virtue of and through the terms of the License Agreement.  ARS had no

other rights to AA data.  ARS knew AA had a right of first refusal under the License Agreement

but did not notify AA of its sale to Kinum.  At the time of ARS' sale to Kinum, ARS had not

formally terminated the License Agreement with AA under the requirements of the License

Agreement.  Rather, ARS had asked this court to declare AA in material breach and the License

Agreement terminated.  At the time of ARS' sale to Kinum, ARS had no declaration from the

court that the License Agreement was terminated.

Moreover, ARS' position that AA's material breach of the License Agreement gave ARS

the right to not only to terminate the License Agreement, obtain damages for the breach, and

disregard AA's right of first refusal but also to sell AA's client and confidential business data to

another industry competitor is not supported by any provision of the License Agreement.  ARS

did not have any kind of ownership interest in AA's data and the License Agreement did not

provide ARS with ay such ownership interest.  ARS had the ability to allow or deny access to the

AA data housed in the ARS Software.  ARS disclosed all of AA's data to Kinum when it sold the

ARS Software to Kinum, one of AA's direct competitors.  AA was unaware of the transfer of the

ARS Software from ARS to Kinum until AA received documents and conducted depositions in

the course of this lawsuit.  ARS cannot deny that it disclosed the AA data to Kinum and that AA

never authorized such disclosure.  As a result of the unauthorized disclosure, AA was damaged

by having a competitor with its confidential data and by, eventually, having to migrate the AA

data from the ARS Software to a different software platform.  AA has presented evidence that

this required it to stop growing its business.

ARS argues that even if AA had taken reasonable precautions to protect its data prior to

March 2013, AA's failure to timely make payments to ARS under the License Agreement

terminated whatever rights of control over the data AA might have otherwise possessed.

However, this argument ignores the procedures set forth in the License Agreement for

termination and effectively concedes that ARS treated the AA data as if it owned it as a result of

AA's alleged breach.  While the court has concluded that AA did not materially breach the License Agreement when it sought to resolve a dispute regarding the fees prior to remittance of those fees, even if AA was in breach, there is no basis for Counterclaim Defendants' assertion that AA surrendered the AA data to ARS when it failed to make a payment.

If AA had materially breached the agreement, ARS was entitled to terminate the license and seek remedies for breach of contract.  ARS was not entitled to seize the data, transfer it to competitors, and hold the data for ransom, knowing that AA could not afford to lose its client base.  Counterclaim Defendants take the extraordinary position that they were entitled to acquire, use, and transfer AA's client data without AA's authorization because AA failed to make a payment.  Even assuming that AA materially breached the License Agreement, AA never surrendered its rights to the AA data that it housed in the ARS Software.  That information was a core part of AA's business.  Moreover, if ARS had properly followed the terms of the License Agreement in terminating the agreement, the License Agreement provided for a ninety-day transition period that would have allowed AA the opportunity to migrate its data off the ARS Software.  Therefore, the court concludes that ARS' unauthorized disclosure of AA's data misappropriated AA's trade secret data.

The evidence further demonstrates that Kinum misappropriated AA's trade secrets by acquiring, using, and disclosing the data.  Kinum, an industry competitor, acquired the AA data knowing or having reason to know that it was a trade secret acquired by improper means.  Kinum used AA's data by collecting the $20,000 monthly payments that AA thought it was paying to ARS under the License Agreement for access to the ARS Software, which housed the AA data. Kinum knew that AA needed access to the data and that AA's business would be hurt without it. Therefore, Kinum used the data for commercial use in order to get the monthly payments under

the License Agreement from AA.  Because this lawsuit was ongoing at the time of the ARS sale to Kinum, Kinum was also aware of the dispute between the parties and took the risk of how this court would rule on the alleged material breach issue.  However, even if the court had not found a material breach, Kinum should have discovered in its due diligence that ARS had no right under the License Agreement to transfer AA's confidential data to another party.

Kinum also disclosed the AA data to Sajax when Kinum sold the ARS Software to Sajax. Kinum knew that AA did not consent to the sale of the ARS Software and did not consent to disclosure of AA data to Sajax.  The Kinum Agreement selling the ARS Software to Sajax expressly included a provision about obtaining AA's consent.  But neither Kinum nor Sajax sought AA's consent.  The signature line on the Kinum Agreement for AA's consent was left blank.

Finally, the evidence also demonstrates that Sajax misappropriated AA's data when it acquired the data knowing or having reason to know that it was a trade secret acquired by improper means.  As with Kinum, Sajax was a competitor.  Kinum provided Sajax a logon password for an existing user as a means of preventing AA from detecting a new user had access to the AA data.  At the time Sajax acquired the ARS Software, Sajax was aware of the License Agreement, which included ARS' duty to keep AA data in a secure environment.  Sajax used the AA data without AA's express or implied consent.  Because the timing of Kinum's sale to Sajax also occurred during the pendency of this litigation, Sajax was also aware of the dispute between the parties with respect to the License Agreement and chose to take the risk of how the court would rule.  Moreover, Sajax attempted to get $250,000 from AA for AA's own data.  This attempt to profit from AA's data demonstrates that Sajax knew the value of the information. Sajax had just purchased the ARS Software for only $188,000.

The court concludes that ARS's decision to transfer the AA data without AA's authorization was a misappropriation of AA's trade secrets.  In addition, Kinum and Sajax's acquisition, use and transfer of the data are also misappropriations of AA's data.  ARS', Kinum's, and Sajax's misappropriations damaged AA's business.  Accordingly, the court grants AA's motion for summary judgment on its UTSA claims, denies ARS' summary judgment motion on the same issue, and reserves the determination of damages for trial.

## CONCLUSION

Based on the above reasoning, (1) Sajax Software, LLC's Motion for Partial Summary Judgment on American Agencies, LLC's Claims Against Sajax Software, LLC, Docket No. 170, is DENIED; (2) Sajax Software, LLC's Motion for Partial Summary Judgment on Sajax Software, LLC's Unjust Enrichment Claim Against American Agencies, LLC, Docket No. 236, is DENIED; (3) American Agencies' Motion for Summary Judgment Against Sajax's First Claim for Relief for Breach of Contract, Docket No. 240, is GRANTED; (4) American Agencies' Motion for Summary Judgment on Its Eighth Claim for Relief (Violations of Utah Trade Secrets Act), Docket No. 241, is GRANTED; (5) American Agencies, LLC's Motion for Summary Judgment As To Claims Related to License Agreement, Docket No. 242, is GRANTED; and (6) Advanced Recovery Systems, LLC's Motion for Summary Judgment on Claims for Breach of Contract and Trade Secret Misappropriation, Docket No. 262, is DENIED.

This Memorandum Decision and Order is issued under seal because several of the motions were filed under seal.  The court, however, requests the parties to notify it within ten days of the date of this order as to whether the seal can be lifted and/or provide the court with what portions would need to be redacted in a public copy of the Order.

The court also notes that this Memorandum Decision and Order does not resolve all the

disputes between the parties in this case because three pending motions were not fully briefed when the court held its September 7, 2016 hearing.  Sajax's Motion for Leave to File Amended Counterclaim recently became fully briefed, and ARS' Motion for Leave to File Second Amended Complaint and the Counterclaim Defendants' Motion to Dismiss Third Amended Counterclaim will both be fully briefed soon.  The court expects to take those motions under advisement and issue a ruling without a hearing.

DATED this 28th day of September, 2016.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

United States District Court
for the
District of Utah
September 28, 2016


******MAILING CERTIFICATE OF THE CLERK******

RE:  Advanced Recovery Systems v. American Agencies et al
     2:13-cv-00283-DAK-BCW


Aaron P. Dodd
FILLMORE SPENCER LLC
3301 N UNIVERSITY AVE
PROVO, UT  84604

Michael K. Erickson
RAY QUINNEY & NEBEKER (SLC)
36 S STATE ST STE 1400
PO BOX 45385
SALT LAKE CITY, UT  84145-0385

Barnard N. Madsen
FILLMORE SPENCER LLC
3301 N UNIVERSITY AVE
PROVO, UT  84604

Aaron K. Olsen
RAY QUINNEY & NEBEKER (SLC)
36 S STATE ST STE 1400
PO BOX 45385
SALT LAKE CITY, UT  84145-0385

Peter  Reichman
FILLMORE SPENCER LLC
3301 N UNIVERSITY AVE
PROVO, UT  84604

Robert O. Rice
RAY QUINNEY & NEBEKER (SLC)
36 S STATE ST STE 1400
PO BOX 45385
SALT LAKE CITY, UT  84145-0385

Steven R. Sumsion
SUMSION BUSINESS LAW
3651 N 100 E STE 300
PROVO, UT  84604

Kevin R. Worthy
SUMSION BUSINESS LAW
3651 N 100 E STE 300
PROVO, UT  84604

Jason M. Zundel
SUMSION BUSINESS LAW
3651 N 100 E STE 300
PROVO, UT  84604



_____/s/Elizabeth Toscano_____
Elizabeth A. Toscano, Docket Clerk