**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **ADVANCED RECOVERY SYSTEMS, LLC,** | **MEMORANDUM DECISION AND ORDER** |
| **Plaintiff,** | |
| **vs.** | **Case No.  2:13CV283DAK** |
| **AMERICAN AGENCIES, LLC, ET AL.,** | **Judge Dale A. Kimball** |
| **Defendants.** | |

This matter is before the court on post-trial motions: (1) Advanced Recovery Systems, LLC ("ARS"), Kinum, Inc., Scott Mitchell, Blake Reynolds, and Brent Sloan's (collectively, "Defendants")[1] Renewed Motion for Judgment As a Matter of Law Under Federal Rule of Civil Procedure 50(b) and Alternative Motion for New Trial Under Federal Rule of Civil Procedure 59(a); and (2) American Agencies, LLC's ("AA") Motion and Petition for Punitive Damages, Litigation Expenses, and Prejudgment Interest.  The parties have fully briefed the motions.  The court concludes that a hearing would not significantly aid in its determination of the motions.  Accordingly, the court issues the following Memorandum Decision and Order based on the memoranda submitted by the parties, as well as the law and facts relevant to the motions.

---

[1] Because only counterclaims proceeded to trial, the parties agreed to switch the original plaintiff/defendant designations in this case.

# DISCUSSION

## Defendants' Renewed Motion for Judgment As a Matter of Law

Alleging that this litigation improperly went against them at every turn, Defendants assert over thirty grounds for judgment as a matter of law. Of those thirty-nine grounds, however, only eleven were raised in Defendants' original Rule 50(a) motion for judgment as a matter of law. It is well established that "[a]rguments presented in a Rule 50(b) motion cannot be considered if not initially asserted in a Rule 50(a) motion." *Perez v. El Tequila, LLC*, 847 F.3d 1247, 1255 (10th Cir. 2017). "The renewed motion under Rule 50(b) cannot assert grounds for relief not asserted in the original motion." *Marshall v. Columbia Lea Reg'l Hosp.*, 474 F.3d 733, 738-39 (10th Cir. 2007). This rule promotes fairness and completeness by "ensuring an opposing party has sufficient notice of an alleged error so that it may be cured before the party rests its case." *United Int'l Holdings, Inc. v. Warf (Holdings) Ltd.*, 210 F.3d 1207, 1229 (10th Cir. 2000). While "[t]echnical precision is unnecessary," Rule 50 requires that the grounds of the original motion "be stated with sufficient certainty to apprise the court and opposing counsel of the movant's position with respect to the motion." *Id.* According to this precedent, this court will not consider the arguments in Defendants' Rule 50(b) renewed motion that were not adequately raised in their Rule 50(a) motion.[2]

With respect to the arguments properly raised, the court notes that relief under Rule 50(b)

---

[2] Leading up to trial and throughout trial, the court was exceedingly lenient in allowing Defendants to raise issues that were untimely and should have been procedurally barred. However, at this stage of the litigation, precedent is clear that Defendants must be bound to the issues that they properly raised. Likely because of the leniency the court had previously shown with respect to untimely raised matters, AA opposed each of the procedurally barred issues. The court notes that if it had been proper to address these issues, the court would have adopted AA's analysis on each point.

is "appropriate in very limited circumstances." *Gulf Coast Shippers Ltd. P'ship v. DHL Express (USA), Inc.*, 2016 WL 6821798, at *1 (D. Utah Sept. 6, 2016). Rule 50(b) relief is to be "cautiously and sparingly granted." *Weese v. Schukman*, 98 F.3d 542, 547 (10th Cir. 1996). A party is entitled to judgment as a matter of law "only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 796 (10th Cir. 2001).

"'[I]n entertaining a motion for judgment as a matter of law . . . the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.'" *Flitton v. Primary Residential Mrtg., Inc.,* 238 Fed. Appx. 410, 415-16 (10th Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000)) (overturning district court's grant of post-trial motion for judgment on pleadings).

As an initial matter, Defendants generally attack the court's preliminary instruction to the jury because it informed the jury of prior rulings by the court. However, the preliminary instruction merely gave the jury context for its role in this litigation. The jury had to be informed of rulings as to liability made as a matter of law at the summary judgment stage if the jury was to assess damages on the same claim. To the extent that the preliminary instruction stated facts, those facts were undisputed facts at the summary judgment stage. Defendants' desire to relitigate those facts at trial was procedurally improper. The court has routinely given similar preliminary

instructions in other cases and does not believe that the instruction in this case prejudiced the jury against Defendants. The jury was fully instructed as to how to rule on each issue put before it and the court must assume that the jury followed all the instructions the court gave it.

## A. Interference with Contract Claim

Defendants argue that they are entitled to judgment as a matter of law on AA's claim for tortious interference with contract because (1) it was legally impossible after June 10, 2013 for Kinum or its officers to interfere with the ARS-AA License Agreement if Kinum and ARS merged, (2) even if the court reverses the jury's successor liability verdict, AA failed to prove the existence of a valid contract after June 10, 2013, with which Defendants could have interfered, (3) AA failed to offer sufficient evidence of inducement by any Defendant before June 10, 2013, (4) AA failed to offer sufficient evidence that Kinum possessed the requisite knowledge of the AA-ARS License Agreement before June 10, 2013, and (5) AA failed to offer sufficient evidence to prove that Reynolds and Mitchell acted outside the scope of their duties as officers of ARS before the June 2012 transaction. The only two issues Defendants raised in their Rule 50(a) motion and that are properly before the court are whether Kinum had the requisite knowledge and whether Reynolds and Mitchell acted within the scope of their duties as officers. As explained by the precedent above, the court will not consider the issues Defendants failed to raise in their Rule 50(a) motion.

### (A) Kinum's Knowledge

When viewed in the light most favorable to AA, there is substantial evidence in the record to support the jury's verdict that Kinum tortiously interfered with the AA-ARS License Agreement. With respect to the tortious interference with contract claim, the court instructed the

jury, among other things, that AA had to prove that (1) Kinum either knew or should have known of the existence of the AA-ARS License Agreement, (2) Kinum's acts in inducing ARS to breach the contract with AA were intentional, and (3) the proximate result of Kinum's acts was that ARS was induced to breach the AA-ARS License Agreement.

The following evidence supports the jury's determination that Kinum "induced" ARS to breach the AA-ARS License Agreement: (1) Kinum offered ARS' officers shares in Kinum, positions at Kinum, monthly base salaries, and cash payments to induce the officers to sell their individual interests in ARS in violation of AA's rights of first refusal; (2) Kinum agreed to pay, and did pay, for ARS' lawsuit against AA to induce ARS to sell itself to Kinum in violation of AA's rights of first refusal.

There was substantial circumstantial evidence that Fidelis officers were aware that AA had a right of first refusal to purchase ARS. In mid-April 2013, Bruce Klinger learned that Mitchell and Reynold's plan to purchase AA fell through. At this time Klinger and Rick Rainho had telephone conversations with Sloan, Mitchell, and Reynolds who were preparing to sue AA for an alleged breach of contract that would, if successful, relieve ARS of the obligation to give AA a right of first refusal. Prior to the sale of ARS to Kinum, Sloan, Mitchell, and Reynolds sought and received legal advice regarding the enforceability of AA's right of first refusal. Klinger was aware that ARS' attorneys had taken the position that AA's alleged breach would relieve ARS' of giving AA a right of first refusal and that the lawsuit was pending at the time of Kinum's purchase. In acknowledging that he knew ARS was able to sell itself to Kinum if there was a breach, Klinger also reveals his awareness that if there was no breach, ARS was not able to sell to Kinum. A jury could conclude that Klinger admitted to knowing that AA had a right of

first refusal and that ARS would violate that right by selling to Kinum before the breach of contract issue was adjudicated.

It is undisputed that as of the effective date of the Fidelis Shareholder Agreement at least four of Kinum's six officers, prior to the sale of ARS, had known they would be interfering with AA's contractual rights absent some legal justification for the sale. Defendants' mistaken belief that AA breached the License Agreement first did not render Defendants' interference unintentional or justify Defendants' actions. *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1930 (2015).

In addition, Kinum is liable for the tortious acts of interference by its incorporators because Kinum accepted the benefits of their tortious conduct. While it is "the general rule that corporations are usually exempt from liability for the torts of their promoters or incorporators," this rule, "like most rules . . . has its exceptions." *Nanodetex Corp. v. Defiant Techs.*, 349 Fed. Appx. 312, 2009 WL 3303709, at *8 (10th Cir. 2009) (unpublished). For example, "corporations are usually prevented from retaining the benefits of wrongful conduct while escaping liability for it." *Id.* In this case, after June 10, 2013, Kinum knowingly retained the benefits of the sale of ARS even though the majority, if not all, of Kinum's officers knew of AA's right of first refusal in the AA-ARS License Agreement. As such, the individual Defendants' pre-incorporation knowledge of the interference with AA's contractual right is imputed to Kinum, which retained the benefits of that tortious interference.

### (B) Reynolds and Mitchell

Defendants claim that AA failed to offer sufficient evidence to prove that Reynolds and Mitchell acted outside the scope of their duties as officers of ARS before the June 2012

transaction.  However, in effectuating ARS' sale to Kinum, Mitchell and Reynolds acted as shareholders of ARS, not officers.  In executing the Fidelis Shareholder Agreement–the document by which Kinum was organized and purchased ARS–Mithcell and Reynolds never signed in their capacity as officers of ARS.  The Fidelis Shareholder Agreement refers to them only as "ARS Shareholders," and they signed the Agreement in their capacities as new "shareholders" of Kinum.  The jury found that ARS and Kinum merged.  As such, Mitchell and Reynolds acted as ARS shareholders, owners in their personal capacities, when they effected the merger of ARS with Kinum.  While Defendants have asserted that the sale of ARS was a mere asset sale, they jury found a merger.  Rather than acting as officers for the general well being of ARS as a whole, the jury could have concluded from the evidence that Mitchell and Reynolds acted for purely personal reasons in selling their individual shares in exchange for compensation form Kinum.  As a consequence of the transaction, ARS ceased to exist.  The jury had evidence from which to conclude that Mitchell and Reynold's sale of ARS was not a corporate act by its officers, but a sale of its shares by its shareholders acting in their personal capacities.  Therefore, holding Mitchell and Reynolds accountable for their interference would not have a chilling effect on the actions of corporate officers.

Defendants also argue that if the court does not grant judgment as a matter of law on AA's contractual interference claim in full, a new trial is necessary on the claim based solely on allegations prior to June 10, 2013.  Defendants ask the court to order a new trial focused strictly on the allegations pre-dating June 10, 2013, because there is no way to know whether or to what extent the jury based its verdict on Defendants' later conduct.  At trial the parties disputed whether Kinum merged with ARS.  If the jury had determined there was no merger, Kinum

would have interfered with AA's contractual rights by inducing ARS to sell the ARS Software to Sajax. Therefore, there was no basis for preventing AA from arguing that the February 2014 sale to Sajax was also evidence of Defendants' interference. Defendants could have asked the court to instruct the jury that Kinum could not have been liable for any alleged acts of interference after the date of any merger, but they did not. Defendants failure to request the instruction or to make such an argument to the court during trial is not a basis for a new trial. Rather, Defendants' position on the issue is waived. Defendants reliance on *United States v. McKye*, 734 F.3d 1104, 1110 n.6 (10th Cir. 2013), a criminal case, is misplaced in this civil setting.

In addition, Defendants contend that judgment as a matter of law is proper on AA's claim for consequential damages based on its tortious interference with contract claim because recovery of fees incurred in pursuit of damages against a defendant is categorically precluded by the third-party tort rule. However, this issue was not raised in Defendants' Rule 50(a) motion, and the court will not consider it.

Furthermore, Defendants argue that judgment as a matter of law is proper on AA's claim for punitive damages in relation to its interference with contract claim because AA did not present clear and convincing evidence that Defendants acted as a result of willful and malicious or intentionally fraudulent conduct or with a knowing and reckless indifference toward AA's rights. Specifically, Defendants assert that (1) punitive damages are improper because it is undisputed that Defendants acted in reliance on the advice of counsel, (2) AA offered no evidence at trial refuting the testimony at trial that Kinum's officers lacked the requisite knowledge to support an award of punitive damages, (3) AA relies on Defendants' acts related to other claims to show a reckless disregard for AA's rights, and (4) AA offered no evidence of the

aggravating circumstances required to award punitive damages under Utah law. The only grounds stated in Defendants' Rule 50(a) motion against an award of punitive damages for AA's tortious interference with contract claim was that Defendants believed that AA had materially breached the AA-ARS License agreement and that ARS had terminated that agreement. In their Rule 50(b) motion, Defendants appear to abandon that argument and instead raise several new grounds for overturning the jury's punitive damages verdict. None of these arguments were raised in Defendants' Rule 50(a) motion and are not properly before the court.

However, to the extent that Defendants claim in its Rule 50(a) motion could be construed to be the same as the Rule 50(b) argument that Defendants could rely on counsel's advice regarding the breach, the court will address that issue. The law does not support a ruling that relying on the advice of counsel makes you immune from a punitive damages award. In fact, the jury could have reasonably inferred that Defendants sought legal advice as a cloak to their reckless behavior toward AA. *See Quinby v. WestLB AG*, 2008 WL 3826695, at *2 (S.D.N.Y. Aug. 15, 2008) ("Seeking advice of counsel does not as a matter of law preclude a punitive damage award; indeed, such consultation may instead establish that a defendant knew about the legal consequences of its actions."). In this case, while Defendants claim to have relied on counsel's advice, they did not openly inform AA that it was taking such action on advice of counsel. Rather, they concealed their actions from AA. The court cannot second-guess how the jury chose to view such evidence. Accordingly, Defendants have failed to demonstrate that they are entitled to judgment as a matter of law on this issue.

### B. Civil Conspiracy Claim

Defendants also argue that judgment as a matter of law on AA's claim for civil

conspiracy to interfere with the AA-ARS License Agreement because (1) conspiracy cannot be proven without a showing that an underlying tort was committed, (2) AA has not offered sufficient evidence in support of the elements of civil conspiracy, and (3) AA has not shown that it sustained damage as a proximate result of the conspiracy's activities. Only the first of these arguments were made in Defendants' Rule 50(a) motion. Therefore, it is improper for the court to address the remaining issues.

Although Defendants claim that there is no underlying tort as a basis for the conspiracy, the court has already addressed that there was substantial evidence at trial of Defendants' tortious interference with AA's contractual rights under the AA-ARS License Agreement. Therefore, Defendants' argument does not provide grounds for a judgment as a matter of law.

### C. Trade Secret Misappropriation Claim

Defendants further argue that they are entitled to judgment as a matter of law on AA's claim for trade secret misappropriation because (1) the court should reverse its summary judgment ruling the ARS and Kinum misappropriated AA's trade secrets, (2) AA failed to present evidence that any of the individual defendants personally participated in any activity that would qualify as misappropriation of trade secrets under Utah's trade secret act, and (3) AA's evidence regarding lost profits damages failed to rise above speculation or provide a reasonable estimate of damages. Defendants did not raise the issue regarding lost profits in their Rule 50(a) motion. Therefore, the court will not consider that issue.

*(A) Reconsideration of Prior Ruling*

Defendants ask this court for the third time to reconsider its summary judgment ruling with respect to the trade secrets claim. Defendants' request is necessarily brought under Federal

Rule of Civil Procedure Rule 59. However, "[p]rocedurally, a Rule 59(e) motion 'is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing.'" *Headwater Res., Inc. v. Illinois Union Ins.*, 770 F.3d 885, 900 (10th Cir. 2014). Defendants argue that Kinum never acquired AA's data from ARS and, therefore, never disclosed it to Sajax, and that Kinum never used AA's data within the meaning of the Utah trade secrets act. These arguments were available to Defendants during the summary judgment briefing and are procedurally improper.

In any event, the request for reconsideration also fails on the merits. The summary judgment record and the trial record support the court's conclusion that Kinum acquired AA's data from ARS. Defendants did not dispute this on summary judgment. Kinum admitted the following undisputed facts: (1) ARS had the ability to allow or deny access to the AA Data housed in the ARS Software; (2) On or about June 13, 2013, Kinum acquired from ARS all of the AA Data when Kinum acquired the ARS Software, which housed all of the AA Data; and (3) Kinum knew that if AA's access to the ARS Software and AA Data were cut off, there would be damage to AA's customers. Defendants admitted that by possessing and controlling access to AA's data, Kinum had acquired AA's data.

Defendants assert that evidence offered at and admission made during trial warrant reconsideration fo the court's findings at the summary judgment stage. Defendants point to Jeff Baker's testimony that other Kinum personnel did not have "credentials" to see AA's data. However, Jeff Baker's testimony was consistent with his deposition testimony that was before the court on summary judgment. Jeff Baker's testimony was not new, uncontradicted, or exculpatory. Sloan admitted to the jury that he had testified in his deposition that ARS could

11

have gone in and looked at any and every AA client because his company was providing the database. Even if Baker was the only Kinum employee to access AA's data, this is still evidence that Kinum acquired AA's data. Baker was Kinum's agent and acted under Kinum's direction. As Kinum's agent, Baker accessed AA's data. AA never authorized Baker to access AA's data on behalf of Kinum. Through its agents–Baker, the Colorado hosting company, and Base Camp Franchising's IT personnel–Kinum also controlled access to AA's data and made decisions about the security of AA's data. AA could not even access its own data without Kinum's, and later Sajax's, consent. The summary judgment record and trial record also support the conclusion that Kinum used AA's data to perform services and collect $20,000 monthly payments. AA had no choice but to continue to do business with Kinum because Kinum had complete control of AA's data. Defendants do not dispute that Kinum used the ARS Software to collect monthly payments from AA and that the ARS Software used the AA data in the course of performing its letter service functions. Moreover, the summary judgment record and the trial record support the court's prior conclusion that Kinum disclosed AA's data to Sajax. Defendants did not dispute that Kinum disclosed AA's data to Sajax until after this court found that the data was a trade secret and ARS and Kinum were liable for misappropriating AA's trade secrets. Defendants rely on evidence at trial to dispute Kinum's purpose in giving Sajax access to AA's data, not the fact that Kinum gave Sajax access. Kinum knew that Sajax was a competitor of AA's and knew that its disclosure of AA's data to Sajax was not authorized by AA. Given this evidence, the court finds no basis for reconsidering its prior rulings.

*(B) Individual Defendants*

Defendants argue that Aa had to prove each element of a UTSA claim was met as to each

individual defendant. This is correct, however, Defendants fail to acknowledge Utah case law that a corporate director, officer, or owner is liable for the corporation's tortious conduct "of his own or in which he participates." *Armed Forces Ins. Exch. V. Harrison*, 70 P.3d 35, 41 (Utah 2003). A corporate officer must participate in "all the essential elements" of the corporation's tort. *Id.* at 44. The Utah Supreme Court makes clear that an officer can also be liable for tortious conduct in which he participates, not just his own tortious conduct. Thus, the correct standard is that an officer of a corporation is liable for the officer's own tortious conduct and also for the corporation's torts in which he participates in all the essential elements.

In this case, the Defendants dispute whether there was substantial evidence as to the individual Defendants' knowledge of Kinum's acquisition, use, and disclosure of AA's trade-secret protected data. Defendants do not dispute that Sloan, Mitchell, and Reynolds knew the ARS Software housed AA's data. There was substantial evidence at trial that each of the individual Defendants knew Kinum acquired AA's data and controlled access to it without AA's knowledge, that the data was being used with the Software, that Kinum was receiving payments from AA, and that Kinum eventually sold the ARS Software, which they knew included the AA data, to Sajax.

Defendants, however, argue that Sloan, Mitchell, and Reynolds never accessed AA's data and thus did not learn the secret. The UTSA defines improper acquisition as "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." Utah Code Ann. § 13-24-2(2)(a). Nothing in this provision requires the individual Defendants to have knowledge of the trade secret. The provision only requires knowledge or a reason to know that the trade secret was acquired by improper means.

There was substantial evidence at trial that Sloan, Mitchell, and Reynolds knew that Kinum acquired AA's data secretly and without AA's authorization.

Courts recognize that one need not comprehend or know what a particular trade secret is in order to know that a trade secret has be acquired. "Although the UTSA uses the phrase 'knowledge of the trade secret,' there is no authority that this phrase creates an element of comprehension. Rather, this phrase is generally understood to reflect knowledge that the trade secret was derived through improper means." *ClearOne Communications, Inc. v. Chiang*, 2007 WL 4376125, at \*2 n.3 (D. Utah Dec. 13 2007).

Defendants reliance on *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 217 (2010), *as modified on denial of reh'g*, (May 27, 2101), does not support their position. The defendant in *Silvaco* never possessed the plaintiff's trade secret, only executable object code made from the trade secret source code. The *Silvaco* court recognized that "[t]o 'know' a thing is to have information of that thing at one's command, in one's possession, subject to study, disclosure, and exploitation. To say that one 'knows' a fact is also to say that one possesses information of that fact." *Id.* at 226. The court also noted that possession, not knowledge, was an element of a trade secrets cause of action under the Restate of Unfair Competition. *Id.* Unlike the defendant in *Silvaco*, Defendants had possession of and access to AA's trade secrets. There was also circumstantial evidence the jury could have relied upon to find that Defendants did access the AA data. Because there was substantial evidence for the jury to discredit the Defendants' testimony that they protected and never accessed AA's client data, Defendants' motion for judgment as a matter of law on this issue fails.

### D. Implied Covenant of Good Faith and Fair Dealing Claim

Defendants also contend that judgment as a matter of law is proper on AA's claim for breach of the implied covenant of good faith and fair dealing claim because (1) damages for breach of the implied covenant of good faith and fair dealing and breach of contract are an impermissible double recovery, and (2) AA's recovery for breach of the implied covenant of good faith and fair dealing is legally impossible because AA failed to introduce evidence of "intentionality" by any Defendant.

*(A) Double Recovery*

Defendants assert that the $50,000 jury award for breach of the implied covenant of good faith and fair dealing claim is an impermissible double recovery for the same alleged harm as AA's breach of contract claim. However, the breach of contract claim was based on ARS' breach of AA's right of first refusal under the AA-ARS License Agreement. AA's breach of the implied covenant of good faith and fair dealing claim is based on evidence that ARS rewrote RILAs to eliminate the $25,000 license fee, to reduce the $600,000 sales quotas, and otherwise to enter improper side agreements. This verdict is, therefore, not based on the same harm. Each of ARS' breaches caused distinct pecuniary losses. AA may recover for each of these distinct losses. Therefore, there is no basis for judgment as a matter of law on this issue.

*(B) Intentionality*

Defendants also argue that ARS cannot be liable for intentionally destroying or injuring AA's rights under the contract because Defendants presented evidence that they acted under the honest and good faith belief that AA had materially breached the AA-ARS License Agreement. Defendants, therefore, contend that AA cannot prove that any Defendant acted in a way that

destroyed or injured AA's rights under the AA-ARS License Agreement at any time after the filing of this lawsuit. However, Defendants' argument mistakenly assumes that AA's claim is based on Defendants' actions after the filing of the lawsuit. At trial, AA's claim for breach of the implied covenant of good faith and fair dealing was based on conduct prior to the filing of the lawsuit when ARS was rewriting RILAs. While the parties disputed whether Mitchell and Reynolds had the authorization to make such changes, there was sufficient evidence for the jury to conclude that the changes were intentionally made, were not authorized, and injured AA's rights under the AA-ARS License Agreement.

### E. Interference with Business Relations Claim

Defendants assert that judgment as a matter of law is proper on AA's claim for interference with business relations because (1) it cannot be based on the same conduct supporting AA's trade secret claim, (2) the jury had no basis for deciding whether ARS' lawsuit against AA was unfounded, (3) AA offered no evidence that the alleged alteration of the RILA agreements has any causal connection to the data conversion, (4) and the jury's damages award is not supported by the evidence. Defendants did not raise any of these issues in their Rule 50(a) motion and, therefore, the court will not consider them.

However, Defendants did properly raise whether punitive damages could be awarded in relation to its interference with business relations claim. Defendants argue that AA did not present clear and convincing evidence that Defendants' alleged interference was the result of willful and malicious or intentionally fraudulent conduct or conduct that manifests a knowing and reckless indifference for AA's rights. Defendants' arguments refer to the same reasons they cite on the issue of punitive damages for the interference with contract claim. Defendants'

16

arguments fail for the same reasons the court set forth above. There was evidence at trial the jury could rely upon in finding Defendants recklessly indifferent to AA's relationships with its customers when they interfered with those relationships to their own advantage.

**F. Civil Conspiracy to Interfere with Business Relations Claim**

Defendants contend that judgment as a matter of law is warranted on AA's claim for civil conspiracy to interfere with business relations for the same reasons they raised with respect to AA's other civil conspiracy claim. Again, these new arguments were not raised in Defendant's Rule 50(a) motion and the court will not consider them.

**G. Copyright Infringement Claim**

Defendants argue that they are entitled to judgment as a matter of law on AA's copyright claim because (1) there is no evidence of originality in AA's collection letter or service contract, and (2) there is no evidence that any Defendant actually used AA's collection letter or service contract. The only issue properly before the court is whether there was evidence that any of the Defendants used AA's letter or service contract.

To show the second element of "copying," a plaintiff must prove that its works were, in fact, copied and that the copied elements are protectable. *Country Kids 'N City Slicks v. Sheen*, 77 F.3d 1280, 1284 (10th Cir. 1996). The fact of copying can be proved by either direct evidence or, as is more often the case because direct evidence of copying is rarely available, circumstantial evidence of access and substantial similarity. *Autoskill Inc. v. Nat'l Educ. Support Sys., Inc.*, 994 F.2d 1476, 1489 (10th Cir. 1993).

Defendants argue that they did not copy "protectable" elements after applying the abstraction-filtration-comparison. However, there was substantial evidence that Defendants

17

copied AA's works verbatim. Side-by-side comparisons of AA's and Kinum's letters and agreements show word-for-word copying and common errors. Defendants, therefore, by copying everything, necessarily copied protectable elements of AA's copyrighted works. The comparisons could be considered direct evidence of copying and an abstraction-filtration-comparison test to determine substantial similarity is unnecessary. *Storagecraft Tech. Corp. v. Kirby*, 2011 U.S. Dist LEXIS 76370, at *19 n.1 (D. Utah July 3, 2011). Therefore, Defendants have not established that they are entitled to judgment as a matter of law on this issue.

Defendants argument that they did not use the copies in their custody and possession was not raised in Defendant's Rule 50(a) motion and has not been properly preserved.

### H.  Unjust Enrichment Claim

Defendants argue that judgment as a matter of law is appropriate on AA's unjust enrichment claims because (1) AA presented no evidence that any of the individual Defendants received any benefit from the alleged use of ARS' software or AA's materials, (2) unjust enrichment is redundant of AA's breach of contract claim, (3) the claim is preempted by the Utah trade secrets act, (4) AA's damages model was flawed, and (5) there was no evidence that Kinum was unjustly enriched.

Defendants argument that there was insufficient evidence to support the jruy's verdict on AA's unjust enrichment claim is without merit. Kinum earned revenues while enjoying the unjust use and possession of the ARS Software and other AA materials. Kinum was enriched through the receipt of these revenues and the individual Defendants were enriched through the concomitant increase of value in their shares of Kinum. The court cannot speculate on what the jury understood. The court can only determine whether there was evidence in the record at trial

to support the jury's verdict. There was substantial evidence at trial that Defendants' unjust enrichment was earned from Defendants' exploitation of the ARS software. While Defendants attempted to refute AA's experts, the jury was entitled to believe AA's expert testimony. There was also conflicting testimony on the time period of Defendants' use of the ARS Software. However, Rule 50 does not provide a mechanism for overturning a verdict based on a disagreement with the jury's interpretation of evidence. On a Rule 50 motion, the court must view all of the evidence in the light most favorable to the nonmoving party.

In addition, the court does not believe that the jury's award for unjust enrichment and the court's award for contract breach constitute a double recovery. AA is entitled to receive the benefit of the contract rights from ARS as well as to require Defendants to disgorge any benefit they gained from use of what rightfully belonged to AA. Furthermore, the UTSA and Copyright Act do not preempt AA's unjust enrichment claim because the unjust enrichment claim is based on Defendants' use of the ARS Software, not the AA data. Accordingly, the court finds no bases for granting Defendants' motion for judgment as a matter of law on AA's unjust enrichment claim.

## I. Successor Liability Claim

Defendants further argue that judgment as a matter of law is proper on AA's successor liability claim because the evidence at trial showed that the June 2013 transaction between ARS and Kinum was nothing more than an asset purchase in which Fidelis bought the ARS Software and Sajax is ultimately ARS' successor. Defendants again ask the court to weigh the evidence presented to the jury. Defendants simply cite to testimony of their witnesses who claimed that the transaction between ARS and Kinum was an asset purchase rather than a merger. However,

Defendants ignore Kinum's contemporaneous letter describing the transaction as a merger. In addition, Defendants do not review each of the elements for de facto merger with the evidence presented at trial. Accordingly, Defendants have not established that judgment as a matter of law is appropriate on the successor liability claim.

Defendants argument that Sajax became ARS' successor through the sale of the ARS Software to Sajax was not raised in Defendants' Rule 50(a) motion and is not properly preserved.

Based on the above reasoning, Defendant's Renewed Motion for Judgment As a Matter of Law Under Federal Rule of Civil Procedure 50(b) and Alternative Motion for New Trial Under Federal Rule of Civil Procedure 59(a) is denied.

### AA's Motion for Punitive Damages, Litigation Expenses and Prejudgment Insterest

AA moves for an award of punitive damages, litigation expenses, and prejudgment interest.

### A. Punitive Damages

Under Utah law, punitive damages may be awarded: (1) where compensatory or general damages are awarded; and (2) "it is established by clear and convincing evidence that the acts or omissions of the tortfeasor are the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others." Utah Code Ann. § 78B-8-201(1)(a).

Defendants contend that punitive damages are improper and unwarranted in this case. In *Stewart v. Stoller,* 2014 WL 4851861, at *9 (D. Utah Sept. 29, 2014), the court found that "[e]ven when the minimum statutory prerequisites are met, punitive damages are still proper only in rare, 'exceptional cases.'" But *Stewart* involved a case in which the statutory prerequisites

were not met.  In contrast, the jury found that the statutory prerequisites were met in this case.

The jury found against ARS, Kinum, Sloan, Mitchell, and Reynolds for interference with

contract, conspiracy to interfere with contract, interference with business relations, and

conspiracy to interfere with business relations, and awarded compensatory damages on those

claims.  The jury also found that these defendants' interference was willful and malicious, was

intentionally fraudulent, or manifested a knowing and reckless indifference toward, and a

disregard of, AA's rights.  Therefore, AA is entitled to an award of punitive damages under Utah

law.

Punitive damages should be "both reasonable and proportionate to the amount of harm to

the plaintiff and to the general damages recovered."  *State Farm Mut. Auto. Ins. Co. V. Campbell*,

538 U.S. 408, 426 (2003).  Utah courts consider the following factors with respect to the

appropriate amount of punitive damages: "(i) the relative wealth of the defendant; (ii) the nature

of the alleged misconduct; (iii) the facts and circumstances surrounding such conduct; (iv) the

effect thereof on the lives of the plaintiff and others; (v) the probability of future recurrence of

the misconduct; (vi) the relationship of the parties; and (vii) the amount of actual damages

awarded."  *Lawrence v. Intermountain, Inc.*, 2010 UT App 313, ¶ 18.

### (1) Relative Wealth

With respect to the relative wealth of the Defendants, the court must consider whether a

punitive damages award is called for to punish Defendants for their misconduct, given what is

known of their wealth.  *Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶ 33.  There is little evidence

as to the relative wealth of each Defendant.  However, "the introduction of evidence as to the

relative wealth of the defendant is not a technical prerequisite to an award of punitive damages."

*Lawrence*, 2010 UT App at ¶ 20.  There is financial information for Kinum for the years 2013 to 2015 demonstrating yearly income between $438,087 and $967,560.30, and assets between $306,485 and $390,663.  The individual defendants did not produce financial documents.  But, Sloan testified that he had seen Mitchell's financial documents and that his net worth was a few million dollars whereas Sloan's net worth greater than his.  Sloan has invested approximately $1.5 million in Kinum from personal resources and companies he controls.

The evidence presented as to wealth does not support a punitive damages award against Kinum because the compensatory damages awards are significant in relation to Kinum's revenue and assets.  The compensatory damages would not merely be absorbed as a cost of business.  *See Behrens v. Raleigh Hills Hosp., Inc.*, 675 P.2d 1179, 1187 (Utah 1983); *Gleave v. Denver & Rio Grande R.R. Co.*, 749 P.2d 660, 671 (Utah Ct. App. 1988).  The only individual defendant the court concludes has a relative wealth supporting an award of punitive damages is Sloan.  There is no evidence as to Reynolds and the evidence regarding Mitchell is a statement from Sloan.  Sloan, however, has presented evidence of having several million dollars, has invested in Kinum, and has funded most of the litigation.

*(2) Nature and Facts and Circumstances of Defendants' Misconduct*

The jury found that Defendants engaged in conduct above and beyond the conduct necessary for liability on the interference claims.  The jury's verdict was supported by evidence of Defendants' secretive and covert manner and the pains Defendants' took to conceal their actions from AA.  Therefore, this factor weighs in favor of punitive damages as to each of the Defendants.

*(3) Effect on AA and Others*

There was evidence that Defendants' interference with AA's contract rights has a significant effect on AA's business. AA ceased growing, incurred conversion costs, and suffered lost profits. The intangible effects on AA's business are not entirely captured in the jury's compensatory damages award. Therefore, there is a basis under this factor for imposing punitive damages.

*(4) Probability of Future Occurrence*

AA seeks punitive damages in part due to Defendants' failure to acknowledge that they engaged in misconduct with respect to AA's contractual rights. Defendants view the case in terms of technical mistakes whereas AA insists that there is a likelihood that Defendants will repeat their misconduct if not sufficiently punished. Defendants cannot deny that the jury found a knowing or reckless indifference to AA's contractual rights. Therefore, Defendants continued denial of such findings does support a deterrence to prevent such actions in the future.

*(5) Relationship of Defendants and AA*

AA argues that the nature of Defendants' relationship with AA also supports a significant punitive damages award because Mitchell and Reynolds exploited the close relationship they had with AA with the knowing assistance of Sloan and Kinum. Defendants did not attempt to argue against AA's position on this factor. The court agrees with Aa that there was evidence at trial supporting an award of punitive damages on these grounds.

After considering each of these factors, AA asks the court to employ the single-digit multiplier of punitive damages to compensatory damages recommended by the Supreme Court. *See State Farm*, 538 U.S. at 425. However, in weighing each of the factors as to each of the

Defendants the court concludes that, while punitive damages are appropriate, the compensatory damages awarded are in large part sufficient to both compensate AA and deter Defendants from engaging in similar conduct in the future. Based on the court's consideration of all the relevant factors above, the court awards AA punitive damages against Kinum in the amount of $50,000, against Sloan in the amount of $100,000, against Mitchell in the amount of $50,000, and against Reynolds in the amount of $50,000.

### B. Third-Party Litigation Exception

Under Utah law, a party can recover attorney fees as consequential damages arising from a tort where a defendant's misconduct "foreseeably caused the plaintiff to incur attorney fees in litigation with a third party." *Gardiner v. York*, 2006 UT App 496 ¶ 6 n.4. "It is settled that when the natural consequences of one's [tortious conduct] is another's involvement in a dispute with a third party, attorney fees reasonably incurred in resolving the dispute are recoverable from the [tortfeasor] as an element of damages." *South Sanpitch Co. v. Pack*, 765 P.2d 1279, 1282 (Utah Ct. App. 1988). This type of an attorney fee award is known as the third-party litigation exception.

In this case, the second question on the Special Verdict form asked the jury if attorney's fees should be awarded to AA as consequential damages under its Tortious Interference with Contract cause of action. The jury answered, "yes." The jury found liability on the claim against Kinum, Sloan, Mitchell, and Reynolds.

Because the jury found first party liability against each of the Defendants on this claim, Defendants argue that the third-party litigation rule does not apply because none of the parties are third parties. Defendants, however, failed to raise this objection to the proposed jury instructions

and have waived this argument. *Black v. M & W Gear Co.*, 269 F.3d 1220, 1232 (10th Cir. 2001) ("In a civil case each party must live with the legal theory reflected in [the jury] instructions to which it does not object.").

AA agrees that, with respect to each Defendant, AA cannot recover attorney fees incurred from that Defendant. However, AA can recover from each Defendant the attorney fees foreseeably incurred against the other Defendants based on each individual Defendant's interference. Each Defendant had to engage in some conduct in order for the jury to find against it on the interference claim. The question then is whether that interference foreseeably resulted in litigation expenses against another party. The jury answered that question of foreseeability, "yes." The fact that AA joined its causes of action in one lawsuit should not work to its disadvantage. The court agrees with AA that there should be no incentive for parties to bring multiple lawsuits to qualify for attorney fees. Simply naming a party to the same lawsuit cannot be a basis for determining whether the exception applies, especially in complex commercial disputes such as the present case. The court, therefore, concludes that the exception applies in this case with respect to each Defendant.

In this case, AA's claims were inextricably intertwined with Defendants' interference with AA's right of first refusal and exclusivity. In such cases, the Supreme Court has recognized that it can be unreasonable to attempt to allocate attorney fees to particular claims. "Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." *Hensley*

25

*v. Eckerhart*, 461 U.S. 424, 435 (1983).  In this case, the claims overlap and the liability for each Defendant overlaps.  The court has already determined that Defendants' liability for damages from their interference with contract claim would be joint and several and the jury found Defendants liable for conspiracy, which also imposes joint and several liability.

AA asks the court for attorney fees in the amount of $1,564,026.83, which represents expenses related to litigation with Sloan, Kinum, and Sajax prior to November 6, 2014, and attorney fees incurred since November 6, 2014, the date AA amended its counterclaim to plead tortious interference with its rights of first refusal and exclusivity.  In considering an award of attorney fees as special damages, the court employs the lodestar method if calculating fees.  *USA Power, LLC v. PacifiCorp*, 372 P.3d 629, 662-63 (Utah 2016).

AA's petition for attorney fees complies fully with the lodestar formula.  AA has demonstrated the fees AA incurred and were actually paid, the reasonableness of the fees, and the reasonableness of the hourly rates for each attorney in the Utah market.  Defendants do not specifically dispute any of these matters.  Accordingly, the court awards AA $1,564,026.83 in attorney fees against Defendants, to be paid jointly and severally.

### C.  Prejudgment Interest

AA argues that it is entitled to prejudgment interest on the amount of damages the court awarded AA for ARS' breach of contract.  Utah law governs the determination of when it is appropriate to award prejudgment interest.  *BC Tech, Inc. v. Ensil Int'l Corp.*, 464 F. App'x 689, 705 (10th Cir. 2012).  Under Utah law, "an award of prejudgment interest simply serves to compensate a party from the depreciating value of the amount owed over time and, as a corollary, deters parties from intentionally withholding an amount that is liquidated and owing." *Trail*

*Mountain Coal Co. v. Utah Div. of State Lands & Forestry*, 921 P.2d 1365, 1370 (Utah 1996).

"Plaintiffs are entitled to damages for the loss of use of the money that, but for the . . . breach and

ensuing delay, would have been paid to plaintiffs in satisfaction of their . . . claim." *Kraatz v.*

*Heritage Imps.*, 2003 UT App 201, ¶ 75. An award of prejudgment interest is appropriate "when

'the loss ha[s] been fixed as of a definite time and the amount of the loss can be calculated with

mathematical accuracy in accordance with well-established rules of damages." *Iron Head Const.*

*Inc. v. Gurney*, 2009 UT 25, ¶ 11.

In the court's Memorandum Decision and Order, dated September 28, 2016, the court

awarded AA $1,549,595.40 in damages against ARS for violating AA's rights of first refusal and

exclusivity. AA argues that it is entitled to prejudgment interest from the date ARS was sold to

Kinum because that is the date when damages were subject to mathematical calculation.

Defendants, however, contend that AA's loss was not fixed according to Utah law until the court

decided the amount on September 28, 2016 in its Memorandum Decision and Order on summary

judgment.

At summary judgment, the court determined the damages based on Defendants' expert's

valuation of ARS minus the purchase price Sajax paid to Kinum for the ARS Software. Sajax

did not purchase the ARS software from Kinum until February 7, 2014. The court then added

$115,789 in damages based on AA's estimated overpayment for the breach of the exclusivity

provision. This amount was not calculable until January 2015 when AA made its last payment.

Accordingly, the court awards AA prejudgment interest against ARS (1) on the award of

$1,433,806 at the rate of 2.13% from February 7, 2014 to the date of this Order and (2) on the

award of $115,789.40 at the rate of 2.27% from January 1, 2015 to the date of this Order.

**CONCLUSION**

Based on the above reasoning, Defendants' Renewed Motion for Judgment As a Matter of Law Under Federal Rule of Civil Procedure 50(b) and Alternative Motion for New Trial Under Federal Rule of Civil Procedure 59(a) is DENIED and AA's Motion and Petition for Punitive Damages, Litigation Expenses, and Prejudgment Interest is GRANTED as more specifically detailed above. The court requests that AA submit a Final Judgment to the court within five days of the date of this Order incorporating the awards granted in this Order.

DATED this 6th day of September, 2017.

BY THE COURT:

_____
DALE A. KIMBALL,
United States District Judge