FILED
2020 NOV 30 PM 12:32
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| AMERICAN AGENCIES, LLC,<br><br>    Third-Party Plaintiff,<br><br>v.<br><br>BRENT SLOAN,<br><br>    Third-Party Defendant. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT<br><br>Case No. 2:13-cv-00283-JNP-CMR<br><br>District Judge Jill N. Parrish |

Before the court is Brent Sloan's motion for summary judgment on American Agencies' (AA's) claim against him for tortious interference with contract. ECF No. 619. Sloan also argues that, as a matter of law, consequential damages for this cause of action may not include AA's attorney fees. The court GRANTS IN PART and DENIES IN PART the motion for summary judgment.

## BACKGROUND

AA is a debt-collection agency. It used software owned by Advanced Recovery Systems (ARS) to issue a series of automated collection letters for past-due accounts owed to small businesses. AA entered into a license agreement with ARS that gave AA the exclusive right to use the software. The agreement also gave AA the right of first refusal to purchase ARS if the owners offered the company for sale.

The license agreement permitted ARS to recruit independent sales agents to sell AA's debt collection services for a commission. The sales agents were required to pay $25,000 to AA for the

right to sell the services. The license agreement required AA to then pay the $25,000 fee to ARS as consideration for recruiting the sales agent.

In 2012, Sloan was looking to get into the debt collection industry. He began negotiating with the owners of ARS, Scott Mitchell and Blake Reynolds, to form a collection services company. AA was unaware of these negotiations. In early 2013, the owner of AA, Steve Kusic, proposed selling the company to ARS. Mitchell and Reynolds informed Sloan of the offer. Sloan saw the proposed sale as an opportunity to partner with ARS.

During the negotiations for the sale, AA discovered that it had not received a $25,000 payment from some of the sales agents that ARS had recruited. In a March 6, 2013 email with the subject line "Embezzlement," Kusic asked Mitchell and Reynolds to send a check to him for the missing payments. Kusic stated: "Why would you embezzle money, that I would turn around and give you 100% license fee back to you [sic] under the terms of the contract?" A few hours later, Reynolds responded that the six sales agents had insisted on paying the fee directly to it and that ARS had promised them that it would reimburse the fee if "the company is not as we have represented." He stated that ARS would be responsible for reimbursing the money if any refund requests were made. Reynolds also represented in his email that ARS had just wired $75,000 to AA. Kusic sent a reply email in which he stated: "Sorry, this is embezzlement, clear and simple. So my question is why were not forwarded [sic] to AA, the day you received them?" ARS later sent a second $75,000 payment, for a total of $150,000 for the six sales agents recruited by ARS.

Sloan provided a large portion of the $150,000 that was sent to AA for the sales agent fees. He loaned the money to ARS believing that it would be refunded pursuant to the terms of the license agreement between AA and ARS. But AA refused to return the $150,000. On March 20, 2013, Reynolds sent an email to Kusic stating that he still wanted to pursue negotiations for ARS

2

to purchase AA. In the email, Reynolds also gave formal notice of ARS's accusation that AA had breached the license agreement by (1) failing to reimburse travel expenses, (2) failing to make contractual payments on time, (3) failing to pay commissions, and (4) failing to pay back the $150,000 in sales agent fees. Reynolds stated that under the license agreement, AA had 30 days to remedy the deficiencies.

On March 26, 2013, corporate counsel for AA responded to Reynold's email. She stated that AA had rejected ARS's purchase offer. Counsel for AA further asserted that "with what has transpired with the alleged embezzlement issues and unknown changes to our documents, AA cannot in good faith, continue to negotiate under the same terms." She made a counteroffer for a substantially higher price. AA's counsel also denied that AA had breached the license agreement. As to the $150,000 payment, she accused ARS of making unauthorized changes to the contracts signed by the sales agents. She stated that AA had deposited the $150,000 in a separate bank account and that the contract modifications had to be clarified "before discussion about releasing the funds [could] be undertaken."

On April 2, 2013, AA's corporate counsel sent a follow-up letter. She asked Reynolds to state what changes had been made to the contracts signed by the sales agents. She also added a new complaint: "To date Mr. Kusic has not received an acceptable reason for checks being made out to ARS and then ARS depositing those checks. Assuming there is no illegal or malicious intent behind those deposits a reasonable explanation for this activity has yet to be provided." AA's corporate counsel issued an ultimatum: "If we do not receive any acceptable response from you for these issues within seven (7) days, American Agencies will be keeping the funds and forfeiting your commission."

The parties abandoned negotiations for the purchase of AA. ARS, after consulting with lawyers, decided to sue AA. Sloan participated in the decision to sue AA and primarily funded the lawsuit. ARS filed its complaint against AA on April 22, 2013. In the suit, ARS asserted that AA breached the license agreement by: (1) refusing to pay ARS the $150,000 in license fees collected from the sales agents, (2) failing to pay $19,000 for travel expenses, and (3) failing to pay an unknown amount of commissions due under the agreement. ARS sought damages and a declaration that it was no longer bound by the license agreement due to these alleged breaches. ARS also alleged that the parties had formed an enforceable agreement for ARS to purchase AA and that AA breached that agreement by refusing to honor the deal.

In mid-April 2013, Mitchell and Reynolds introduced Sloan to Bruce Klinger and Rick Rainho. Klinger and Rainho owned Fidelis, a debt collection company that competed with AA. In May 2013, Klinger and Rainho traveled to Utah to meet with Mitchell, Reynolds, and Sloan to discuss Fidelis purchasing the assets of ARS. Klinger and Rainho were interested in the deal because they wanted to gain access to the software owned by ARS. The meetings were held in Sloan's offices. Klinger and Rainho were notified of the existence of the licensing agreement between ARS and AA. But they believed that the agreement was no longer binding because AA had breached the agreement. Klinger and Rainho did not know that the license agreement contained a right of first refusal for AA to purchase ARS.

The negotiations were successful and Fidelis acquired the assets of ARS, including the software and its legal claims against AA. Mitchell and Reynolds received shares of Fidelis in exchange. On June 10, 2013, Sloan purchased shares of Fidelis and became its CEO. Fidelis changed its name to Kinum.

4

Meanwhile, AA countersued ARS and asserted third-party claims against Sloan. AA alleged, among other things, that Sloan was liable for tortious interference with the contract between AA and ARS. After about three and a half years of litigation, the court granted summary judgment in favor of AA on all of ARS's claims against it and set a trial date for AA's claims. Before trial, AA asserted that Sloan was liable for its attorney fees as consequential damages for its claim for tortious interference with contract. The jury found that Sloan was liable for tortious interference with contract and determined that attorney fees should be awarded as damages for the claim. The court later found that the proper amount of fees owed was $1,564,026.83.[1]

Sloan appealed the resulting judgment against him. The Tenth Circuit reversed the jury verdict on the tortious interference with contract claim, holding that the court erred by failing to instruct the jury on the "improper means" element of this cause of action.

On remand, Sloan moves for summary judgment on the tortious interference with contract claim. He argues that AA has not produced evidence to support the improper means element of this claim. AA opposes the motion. It argues that the law of the case doctrine bars this court from granting summary judgment. It also asserts that the evidence supports five separate theories of interference with the licensing agreement through improper means. First, AA argues that Sloan conspired with Reynolds and Mitchell to misrepresent to AA that the $150,000 in payments were license fees collected from independent sales agents. Second, AA asserts that Sloan lied to ARS's lawyers by telling them that the $150,000 paid to AA was collected from sales agents. Third, AA

---

[1] This lawsuit initially involved many other parties, claims, counterclaims, and third-party claims. All the claims in the suit have been resolved except for AA's third-party claim against Sloan for tortious interference with contract. Accordingly, the court does not recount the many legal twists and turns of this case here.

contends that Sloan breached his duties to Klinger, Rainho, and Fidelis by failing to disclose the existence of the right of first refusal found in the license agreement before Fidelis purchased the assets of ARS. Fourth, AA argues that Sloan is liable for the tort of wrongful use of civil proceedings by facilitating ARS's lawsuit against AA. Fifth, AA asserts that Sloan is liable for the tort of abuse of process for the same lawsuit.

Sloan also argues that, even if he is not entitled to summary judgment on AA's tortious interference with contract claim, the court should determine as a matter of law that AA may not recover attorney fees as consequential damages for this tort. AA responds that attorney fee damages are appropriate.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment on a claim is required if the party that bears the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

**ANALYSIS**[2]

## I.   LIABILITY FOR TORTIOUS INTERFERENCE WITH CONTRACT

In order to prevail on a tortious interference with contract claim, a plaintiff must prove: "(1) that the defendant intentionally interfered with the plaintiff's existing . . . economic relations, (2) . . . by improper means, (3) causing injury to the plaintiff." *Eldridge v. Johndrow*, 345 P.3d 553, 565 (Utah 2015) (second alteration in original) (citation omitted). The improper means element is limited to "conduct contrary to law—such as violations of statutes, regulations, or recognized common-law rules—or the violation of an established standard of a trade or profession." *C.R. England v. Swift Transportation Co.*, 437 P.3d 343, 355 (Utah 2019).

Sloan moves for summary judgment on the tortious interference with contract claim, asserting that AA has not produced evidence supporting the improper means element. AA argues that the Tenth Circuit held that substantial evidence supported the improper means element and that the law of the case doctrine prevents this court from contradicting this holding. AA also contends that the evidence supports five separate theories of improper means. The court addresses the law of the case argument and each of the five theories of improper means in turn.

### A.   Law of the Case

The jury found Sloan liable for both tortious interference with contract and tortious interference with business relations. Tortious interference with business relations, like tortious

---

[2] AA argues that the court should deny Sloan's motion for summary judgment because he did not comply with the court's local rules. Sloan included a "Facts" section in his brief but did not include a "concise statement of the undisputed material facts." *See* DUCivR 56-1(b). The court agrees that Sloan technically violated this rule. But the court concludes that this violation did not hamper AA's response to or the court's evaluation of the motion. Accordingly, the court denies AA's request to deny Sloan's motion for summary judgment for this violation.

interference with contract, requires proof that the interference was accomplished through improper means. In support of its tortious interference with business relations claim, AA presented two theories of improper means to the jury, arguing that Sloan (1) used deceit to conceal the transfer of the debt-collection software to Fidelus/Kinum and (2) helped to initiate unfounded litigation against AA.

On appeal, Sloan argued that the Tenth Circuit should reverse the jury verdict on the tortious interference with business relations claim because AA failed to establish the improper means element. First, Sloan argued that AA's deceit theory was preempted by Utah statute. But the Tenth Circuit rejected this argument because Sloan had failed to preserve it. *Advanced Recovery Sys. v. Am. Agencies*, 923 F.3d 819, 825 (10th Cir. 2019). Second, Sloan argued that the unfounded litigation theory was not supported by substantial evidence. The Tenth Circuit, however, did not address this argument because Sloan had not challenged the sufficiency of the evidence supporting the deceit theory. Because the jury could have based its verdict on AA's deceit theory of improper means, Sloan's failure to challenge the evidence supporting this theory was fatal to his substantial evidence argument. *Id.* at 826. Thus, the Tenth Circuit affirmed the jury's verdict on the tortious interference with business relations claim without deciding whether substantial evidence supported either AA's deceit or unfounded litigation theories of improper means.

In footnote number eight, though, the Tenth Circuit hypothesized that it would have rejected a substantial evidence challenge to the deceit theory:

> Even if Mr. Sloan had challenged the sufficiency of the evidence on deceit, we would have rejected the challenge. In our view, the trial evidence permitted a reasonable jury to find that Mr. Sloan had deceitfully concealed transfers involving the software and American Agencies' customer data. . . .

8

> First, Mr. Sloan knew before the merger with Kinum that American Agencies had an exclusive license to use the software and a right of first refusal on a sale of Advanced Recovery Systems.
>
> Second, with knowledge of these rights, Mr. Sloan helped to merge Advanced Recovery Systems into Kinum without telling American Agencies of the merger or the transfer of software to Kinum.

*Id.* at 825 n.8.

The Tenth Circuit went on to reverse the tortious interference with contract claim because the court did not instruct the jury on the improper means element of that claim. AA now argues that footnote number eight of the Tenth Circuit's opinion establishes the law of the case on the issue of whether AA has produced sufficient evidence supporting the improper means element of the tortious interference with contract claim. "The law-of-the-case doctrine provides that, 'when a court rules on an issue of law, the ruling "should continue to govern the same issues in subsequent stages in the same case." ' " *Fish v. Schwab*, 957 F.3d 1105, 1139 (10th Cir. 2020) (citation omitted). "Under this doctrine, 'the decision of the appellate court establishes the law of the case and ordinarily will be followed by . . . the trial court on remand . . . .' " *Id.* (citation omitted). The court determines that the law of the case doctrine does not apply here for two reasons.

First, "it is well-settled that '[d]icta is not subject to the law of the case doctrine.' " *Bishop v. Smith*, 760 F.3d 1070, 1083 (10th Cir. 2014) (alteration in original) (citation omitted). The Tenth Circuit held that it need not address Sloan's substantial evidence argument because he did not mount an argument for all the theories supporting the improper means element of the tortious interference with business relations claim. That court's supposition that it would have concluded there was substantial evidence to support the deceit theory if Sloan had made a substantial evidence argument is dicta because it is unnecessary to the disposition of the appeal. *See id.* ("Statements which appear in an opinion but which are unnecessary for its disposition are dicta.").

9

Second, AA does not advance the theory of improper means suggested by the Tenth Circuit. That court hypothesized that it would have found that substantial evidence supported a theory that Sloan breached a legal duty to inform AA of plans to merge ARS with Fidelis. But on remand, AA does not argue this theory. It asserts that Sloan helped Reynolds to lie, that Sloan breached legal duties by lying to his lawyers, and that Sloan breached duties owed to Klinger, Rainho, and Fidelis by failing to inform them of the right of first refusal. Because the theory of improper means discussed in the Tenth Circuit's opinion is not before this court, it is not relevant here.

Accordingly, the court concludes that the law of the case doctrine does not require a finding that the improper means element of the tortious interference with contract claim is supported by evidence.

### B.    *Fraudulent Misrepresentation*

AA argues that Sloan committed the tort of civil conspiracy and that liability for this tort satisfies the improper means element of its tortious interference with contract claim. It asserts that Reynolds lied when he told Kusic that ARS had collected a $25,000 fee from six sales agents and that the money that ARS was forwarding to AA came from those fees. AA further contends that Sloan entered a conspiracy with Mitchell and Reynolds to tell this lie and that Sloan provided much of the money used to make the $150,000 payment.

To prove that Sloan is liable for civil conspiracy, AA must establish that Reynolds made a fraudulent misrepresentation. *See Puttuck v. Gendron*, 199 P.3d 971, 978 (Utah Ct. App. 2008) (cited by *Advanced Recovery Sys.*, 923 F.3d at 824–25) ("The claim of civil conspiracy 'require[s], as one of [its] essential elements, an underlying tort.' " (alterations in original) (citation omitted)). A fraudulent misrepresentation claim requires proof

10

> (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.

*State v. Apotex Corp.*, 282 P.3d 66, 80 (Utah 2012).

Sloan argues that he is entitled to summary judgment on AA's civil conspiracy theory of improper means because AA has not produced evidence supporting all the elements of the underlying tort of fraudulent misrepresentation. Specifically, he asserts that AA has not produced evidence that it reasonably relied upon Reynolds's misrepresentation to act in a way that caused damages. In other words, Sloan contends that AA was not lulled into complacency by any misrepresentation made by Reynolds. The court agrees.

When Kusic discovered that AA had not received $25,000 payments from sales agents recruited by ARS, he sent an email to Mitchell and Reynolds accusing them of embezzlement and demanding a check for payment of these fees. In an obvious attempt to placate Kusic, Reynolds responded to the email by stating that six sales agents had paid ARS directly and that ARS would forward the money to AA. Kusic, however, was not placated. He immediately sent an email to Reynolds stating: "Sorry, this is embezzlement, clear and simple. So my question is why were not forwarded [sic] to AA, the day you received them?" AA then refused to return the $150,000 that ARS had paid. Corporate counsel for AA stated that suspicions that ARS had embezzled the money justified AA's decision to discontinue negotiations for the sale of the company under previously discussed terms. Counsel for AA also stated that Kusic had not received an acceptable explanation

for the $25,000 payments allegedly collected by ARS and that AA would be keeping the money if ARS did not provide an adequate explanation.

In sum, the statement made by Reynolds was met by skepticism, suspicion, and accusations of wrongdoing regarding the $25,000 payments owed by the sales agents recruited by ARS. AA has not pointed to evidence that it relied upon the statements to its detriment. Absent such proof, AA cannot establish an essential element of fraudulent misrepresentation and, in turn, a necessary element of civil conspiracy. Accordingly, Sloan is entitled to summary judgment on this theory of improper means.

> C.    *Violations of Rule 11 and the Rules of Professional Conduct*

AA asserts that ARS's allegation in its complaint that the $150,000 payment was "collected from independent licensees" is not true. It presumes that this falsehood appears in in the complaint because Sloan lied to ARS's lawyers. AA argues that this misrepresentation constitutes a violation of Rule 11 of the Federal Rules of Civil Procedure because Sloan was a client of ARS's lawyers. It also contends that because Sloan is a lawyer,[3] this misrepresentation violates Rule 8.4(c) of the Utah Rules of Professional Conduct, which prohibits "conduct involving dishonesty, fraud, deceit, or misrepresentation." AA argues that these violations satisfy the improper means element of its tortious interference with contract claim.

Sloan counters that because these theories are based on Sloan's alleged communications with his lawyers in preparation for a lawsuit, the judicial proceedings privilege bars liability. The judicial proceedings privilege is an absolute privilege that protects the participants in a litigation

---

[3] Sloan was admitted to the Utah Bar in 1984. But in 2013, he had not practiced law for over 20 years.

from liability for statements made during a judicial proceeding. *See Price v. Armour*, 949 P.2d 1251, 1256 (Utah 1997). Noting that the Utah Supreme Court has held that the judicial proceedings privilege immunizes litigants from tortious interference with business relations claims that are based upon statements made during litigation, *id.* at 1258, Sloan contends that the privilege must also apply to tortious interference with contract claims.

AA argues that the judicial proceedings privilege does not protect Sloan because this privilege applies only to defamation claims or claims arising from defamatory statements. It maintains that the privilege barred liability in *Price* only because the tortious interference with business relations claim at issue in that case was based on an allegedly libelous letter. *See id*. ("Holding that a defamatory statement made during a judicial proceeding is absolutely privileged but then holding that the privilege does not apply to the claim that the statement interfered with a business relation would defeat the very purpose of the privilege and would chill free and open expression in the judicial setting.").

The court disagrees with AA's narrow interpretation of the judicial proceedings privilege. Although "[h]istorically, the judicial proceeding privilege in Utah has been used to 'immunize[ ] certain statements that are made during a judicial proceeding from defamation claims,' " the Utah Supreme Court has "extended the privilege beyond defamation claims to include 'all claims arising from the same statements.' " *Moss v. Parr Waddoups Brown Gee & Loveless*, 285 P.3d 1157, 1165 (Utah 2012) (second alteration in original) (citation omitted). For example, the privilege applies to intentional infliction of emotional distress claims, *DeBry v. Godbe*, P.2d 979, 986 (Utah 1999), and fraud claims, *Bennett v. Jones, Waldo, Holbrook & McDonough*, 70 P.3d 17, 34 (Utah 2003), even though these causes of action do not require a defamatory statement. Indeed, the Utah Supreme Court has expanded the judicial proceedings privilege to encompass not only statements,

13

but also conduct occurring during a judicial proceeding. *Moss*, 285 P.3d at 1166. Noting the importance of the protections afforded by the judicial proceedings privilege, that court found that lawyers who had helped to enforce a civil discovery order were immune from claims for abuse of process, invasion of privacy, intentional infliction of emotional distress, trespass, conversion, and civil conspiracy. *Id.* at 1162–63, 1165–66.

In sum, the Utah Supreme Court has interpreted the judicial proceedings privilege broadly. It has explicitly declined to restrict the privilege to defamation claims or claims based upon defamatory statements. Indeed, that court has held that the privilege immunized lawyers from liability for alleged misrepresentations made to a client about a lawsuit. *Bennett*, 70 P.3d at 34. Thus, AA's claim that Sloan should be held liable for allegedly false communications made to his lawyers in this litigation falls within the ambit of the judicial proceedings privilege. Because the privilege bars this theory of improper means, the court grants summary judgment in favor of Sloan on this theory.

### D.    *Fraudulent Nondisclosure*

AA asserts that Sloan knew about the right of first refusal clause found in the license agreement between AA and ARS. Although Klinger and Rainho knew about the agreement and the software license granted to AA, they did not know about the right of first refusal clause. AA argues that Sloan had a duty to tell Klinger and Rainho about this clause and breached this duty by failing to disclose it. AA implies that if Klinger and Rainho had known about the right of first refusal, they would have refused to consummate the merger of Fidelis and ARS. Thus, AA asserts that Sloan's wrongful conduct towards Klinger and Rainho caused the merger, which, in turn, interfered with AA's contract with ARS.

14

Relying upon a District of Utah ruling and a District of Oregon ruling, Sloan argues that AA's theory is fatally flawed because in order to state a claim for tortious interference with contract, the improper means employed by the defendant must be directed towards the plaintiff. *US Magnesium, LLC v. ATI Titanium LLC*, No. 2:17-cv-923-DB, 2019 WL 1755427, at *3 (D. Utah Apr. 19, 2019) ("None of the cases discussed in the parties' briefing support the theory that the breach of a fiduciary duty owed to a third party constitutes improper means under Utah law . . . . The court declines to expand the definition of improper means to include such conduct . . . ."); *Int'l Longshore & Warehouse Union v. ICTSI Oregon, Inc.*, 15 F. Supp. 3d 1075, 1111 (D. Or. 2014) ("[I]n those jurisdictions that have accepted a breach of fiduciary duty as 'improper means,' the fiduciary duty breached is a duty owed to the plaintiff."). The court respectfully disagrees with these authorities.

The rule articulated by the Utah Supreme Court does not limit the improper means element to wrongful conduct towards the plaintiff. A tortious interference with contract claim requires the plaintiff to prove: "(1) that the defendant intentionally interfered with the plaintiff's existing . . . economic relations, (2) . . . by improper means, (3) causing injury to the plaintiff." *Eldridge*, 345 P.3d at 565 (second alteration in original) (citation omitted). The rule requires only that the interference be accomplished through improper means. There is no requirement that the improper means be directed toward the plaintiff. Instead, "[a] party is subject to liability for an intentional interference with *present* contractual relations if he intentionally and improperly causes *one of the parties* not to perform the contract." *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 201 (Utah 1991) (second emphasis added).

The Restatement (Second) of Torts confirms that the improper means need not be directed towards the plaintiff. The wrongful conduct may be threats of physical or economic harm directed

15

towards the other party to the contract or actions that otherwise prevent the other party from performing an obligation under the contract. RESTATEMENT (SECOND) OF TORTS § 766 cmt. k (1979). Although the Utah Supreme Court declined to adopt the restatement rule in its entirety, *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982), that court has consistently cited section 766 with approval, *see C.R. England*, 437 P.3d at 348; *St. Benedict's*, 811 P.2d at 201; *Nelson v. Jacobsen*, 669 P.2d 1207, 1215 (Utah 1983). Thus, the restatement reflects Utah law on improper means.

Thus, the improper means requirement may be satisfied by wrongful conduct towards a third party that induces a breach of the plaintiff's contract. Accordingly, the court rejects Sloan's argument that the improper means must be aimed at the plaintiff.

In passing, Sloan raises a second argument. He asserts that Klinger's and Rainho's ignorance of the right of first refusal was caused by their neglect in failing to read the license agreement prior to the merger. But this argument is inadequately briefed. Sloan does not cite the record or case law in support of his assertion. Thus, the court may not, at this time, grant summary judgment on AA's fraudulent misrepresentation theory.

The court, however, notes that several questions remain regarding AA's new theory of improper means, which was asserted for the first time on remand. "To support a claim of fraudulent nondisclosure a plaintiff must prove the following three elements: (1) the nondisclosed information is material, (2) the nondisclosed information is known to the party failing to disclose, and (3) there is a legal duty to communicate." *Hermansen v. Tasulis*, 48 P.3d 235, 241–42 (Utah 2002). Sloan's inadequately briefed argument appears to be that Sloan adequately disclosed the right of first refusal because the licensing agreement was made available to Klinger and Rainho. But without citations to the record, it is unclear whether undisputed evidence would support this assertion.

16

Additionally, it is unclear to the court what AA claims to be the source of Sloan's legal duty to disclose the right of first refusal to Klinger and Rainho, who were sophisticated parties with due diligence obligations. Moreover, the court is not certain whether there are disputes of material fact as to whether disclosure of the right of first refusal would have dissuaded Klinger and Rainho from purchasing the assets of ARS given their apparent belief that ARS was no longer bound by the licensing agreement.

In short, the court determines that it may not grant summary judgment on AA's fraudulent nondisclosure theory based on the arguments presented in Sloan's briefs. But because AA has raised this theory for the first time in its response brief, substantial questions remain regarding the underpinnings of the fraudulent nondisclosure theory of improper means. Moreover, the court was unable to question the parties regarding the contours of this theory because oral argument on the motion for summary judgment was cancelled due to the illness of Sloan's counsel.

Accordingly, the court denies without prejudice summary judgment on AA's fraudulent nondisclosure theory of improper means.  Because of the substantial expense to the parties and the public for a jury trial on this issue, however, the court requests further briefing to determine whether summary judgment is warranted. Sloan may file an additional motion for summary judgment raising other arguments regarding the fraudulent nondisclosure theory by January 11, 2021. Sloan should comply with the court's local rules on motions for summary judgment and cite the record or other evidence in support of the motion. AA may file a response brief by February 8, 2021. Sloan may reply by February 22, 2021.

E.      *Wrongful Use of Civil Proceedings*

AA also asserts that the lawsuit filed by ARS and funded in part by Sloan satisfies the

improper means element because Sloan committed the tort of wrongful use of civil proceedings.

An individual

> who takes an active part in the initiation, continuation, or
> procurement of civil proceedings against another is subject to
> liability to the other for wrongful civil proceedings if (a) he [or she]
> acts without probable cause, and primarily for a purpose other than
> that of securing the proper adjudication of the claim in which the
> proceedings are based, and (b) . . . the proceedings have terminated
> in favor of the person against whom they are brought.

*Gilbert v. Ince*, 981 P.2d 841, 845 (Utah 1999) (first alteration in original) (quoting RESTATEMENT

(SECOND) OF TORTS § 674 (1977)). A litigant acts without probable cause if he or she does not

reasonably believe "in the existence of the facts upon which the claim is based" or does not

"correctly or reasonably believe[] that under those facts the claim may be valid under the

applicable law." *Id.* at 845–46 (quoting RESTATEMENT (SECOND) OF TORTS § 675 (1977)).

AA argues that Sloan initiated the lawsuit without probable cause because he did not

reasonably believe the facts on which the claims were based. It points to ARS's complaint, which

alleged that "AA failed to pay to ARS $150,000.00 of license fees collected from independent

licensees as required by . . . the License Agreement." AA argues that Sloan did not believe in the

existence of this fact because he knew that much of the money paid to AA could be traced to

money that he had loaned to ARS.

But ARS's claim for the return of the $150,000 payment did not hinge on a strict tracing

of the $150,000 to the bank accounts of the sales agents ARS recruited. Relatively early in the

litigation, Sloan readily admitted in his deposition that he provided a large portion of the $150,000

that ARS paid to AA. ARS then argued in its opposition to summary judgment that the fact that

18

the $150,000 payment was drawn in part from money provided by Sloan did not negate its breach of contract claim. In addition, ARS asserted claims for unjust enrichment, breach of the covenant of good faith and fair dealing, and money had and received. The success of these claims did not rest on the source of the money paid to AA. Because ARS's claims were not based upon an assertion that the money came directly from the sales agents, the court rejects AA's argument that there was no factual basis for ARS's claims seeking the return of the $150,000.

The court also concludes that Sloan could have reasonably believed that ARS had potentially valid legal claims for the return of the $150,000.  Although AA ultimately prevailed on the breach of contract claim, resolution of this claim rested on judicial interpretations of various provisions of the licensing agreement. ARS's unjust enrichment, conversion, and money had and received claims were also resolved based on the court's interpretation of the scope of the licensing agreement. The court concludes that it would not have been obvious to Sloan that ARS's claims for the return of the $150,000 were not valid under the law. Thus, Sloan did not act without probable cause when he funded ARS's lawsuit.

Moreover, AA does not address ARS's other claims in its lawsuit. In its complaint, ARS also sought compensation for travel expenses and unpaid commissions and damages for breach of an alleged agreement to purchase AA. AA does not address these portions of ARS's lawsuit. For this independent reason, AA has failed to point to evidence showing that Sloan lacked probable cause when he helped to initiate the lawsuit.

In short, AA has not cited evidence supporting the lack of probable cause element of its wrongful use of civil proceedings theory of improper means.[4] Accordingly, Sloan is entitled to summary judgment on this theory.

### F.    Abuse of Process

Finally, AA argues that Sloan is liable for the tort of abuse of process. Under Utah law, "abuse of process applies to '[o]ne who uses a legal process . . . against another primarily to accomplish a purpose for which it is not designed.'" *Gilbert*, 981 P.2d at 845 (alterations in the original) (quoting RESTATEMENT (SECOND) OF TORTS § 682 (1977)). "A claim for abuse of process requires the plaintiff to show (1) that the defendant used legal process, (2) to accomplish an improper purpose or purpose for which that process was not designed, (3) causing the plaintiff's harm." *Mountain W. Surgical Ctr., L.L.C. v. Hosp. Corp. of Utah*, 173 P.3d 1276, 1278 (Utah 2007). "The usual case of abuse of process is one of some form of extortion, using the process to put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it." RESTATEMENT (SECOND) OF TORTS § 682 cmt. b (1977). For example, where a party used a legal process to improperly seize a large number of turkeys before Thanksgiving for the primary purpose of forcing the other party to pay an unrelated debt, the party that used the improperly seized turkeys as a bargaining chip was liable for abuse of process. *Templeton Feed &*

---

[4] To prevail on a wrongful use of civil proceedings claim, AA also must prove that Sloan initiated ARS's lawsuit "primarily for a purpose other than that of securing the proper adjudication of the claim." *Gilbert*, 981 P.2d at 845 (citation omitted). Below, in Part I.F of this ruling, the court concludes that AA has not produced evidence that Sloan initiated the lawsuit for an ulterior purpose. For these same reasons, AA has not pointed to evidence that would support the improper purpose element of wrongful use of civil proceedings. Accordingly, Sloan is also entitled to summary judgment on AA's wrongful use of civil proceedings theory because AA failed to support the improper purpose element of this claim.

*Grain v. Ralston Purina Co.*, 446 P.2d 152, 154–56 (Cal. 1968) (cited with approval in *Hatch v. Davis*, 147 P.3d 383, 390 (Utah 2006)).

AA argues that Sloan is liable for abuse of process because he helped to initiate ARS's lawsuit against AA "as a pretext for consummating the sale of ARS, thereby circumventing [AA's] right of first refusal." But the lawsuit was not a necessary step to consummate the sale of ARS to Fidelis. Nor did it facilitate the merger. The owners of ARS, the owners of Fidelis, and Sloan believed that ARS was no longer bound by the license agreement because AA had committed a material breach. ARS initiated a lawsuit to obtain a judicial confirmation of this theory. Although ARS assumed a significant risk by consummating the merger before obtaining a final ruling on its theory, it did not have to wait. If ARS had been correct, AA would not have had no valid legal claim for breach of the license agreement. *See CCD, L.C. v. Millsap*, 116 P.3d 366, 373 (Utah 2005) ("[U]nder the 'first breach' rule 'a party first guilty of a substantial or material breach of contract cannot complain if the other party thereafter refuses to perform.' " (citation omitted)).

AA appears to assert that ARS's lawsuit helped Sloan to facilitate the sale of ARS because the mere fact that ARS had filed a lawsuit made Sloan's assertion that ARS was no longer bound by the license agreement more persuasive. But this is not the type of improper purpose recognized by Utah law. Sloan did not use a legal proceeding to improperly seize property, *see Templeton Feed & Grain*, 446 P.2d at 154–56, nor did he otherwise use the lawsuit to improperly extort AA, *see* RESTATEMENT (SECOND) OF TORTS § 682 cmt. b (1977). Indeed, even a desire to harm or embarrass a defendant through a lawsuit is not recognized as an improper purpose. *Hatch*, 147 P.3d at 389–90 (legal proceedings "merely accompanied by spite, ill-will, or any of the other less agreeable human emotions that frequently attach themselves to court papers" are insufficient to state a claim for abuse of process); *Palmer v. Tandem Mgmt. Servs., Inc.*, 505 N.W.2d 813, 817

(Iowa 1993) ("[T]here is no abuse of process when the action is filed to intimidate and embarrass a defendant knowing there is no entitlement to recover the full amount of damages sought. Proof of an improper motive by the person filing the lawsuit for even a malicious purpose [is not sufficient]."). Thus, a plaintiff's hope that third parties will believe that his or her claims have merit is not an improper purpose. *See* RESTATEMENT (SECOND) OF TORTS § 682, cmt. b (1977) ("[T]here is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or *an ulterior purpose of benefit to the defendant*." (emphasis added)).

AA has not shown that a dispute of material fact bars summary judgment on the abuse of process theory for an additional reason. "To state a claim for abuse of process, a party must allege both 'an ulterior purpose' and ' "a wilful act in the use of the process not proper in the regular conduct of the proceeding." ' " *Hatch*, 147 P.3d at 389 (citation omitted). Thus, an ulterior motive for filing a lawsuit "is not enough." *Id.* AA does not cite evidence that Sloan committed a willful act in the use of ARS's lawsuit "not proper in the regular conduct of the proceeding." Because there is no evidence that Sloan or ARS did anything in prosecuting its claims other than seek a favorable judicial resolution, an abuse of process claim may not stand. *See* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 121 (5th ed.1984) ("[T]here is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions.").

For these reasons, Sloan is entitled to summary judgment on AA's abuse of process theory of improper means.

## II.      ATTORNEY FEES AS CONSEQUENTIAL DAMAGES

AA seeks attorney fees as consequential damages for its tortious interference with contract claim. It argues that it is entitled to fees as damages under the third-party litigation rule, which "allows recovery of attorney fees as consequential damages, but only in the limited situation where the defendant's [wrongful conduct] foreseeably cause[s] the plaintiff to incur attorney fees through litigation with a third party." *Macris & Assocs., Inc. v. Neways, Inc.*, 60 P.3d 1176, 1179 (Utah Ct. App. 2002) (alterations in original) (citation omitted); *accord Broadwater v. Old Republic Sur.*, 854 P.2d 527, 535 (Utah 1993) ("when the natural consequence of one's negligence is another's involvement in a dispute with a third party, attorney fees reasonably incurred in resolving the dispute are recoverable from the negligent party as an element of damages." (citation omitted)). AA asserts that Sloan's tortious interference with the license agreement caused it to litigate with third parties to protect its rights under that contract. It contends, therefore, that it is entitled to attorney fees incurred in litigating these claims.

Sloan moves for summary judgment on AA's claim for attorney fee damages. He first argues that attorney fee damages are not appropriate in this case because the third-party litigation rule does not apply to joint tortfeasors. *See OnePoint Sols., LLC v. Borchert*, 486 F.3d 342, 352 (8th Cir. 2007); *Vacco Indus., Inc. v. Van Den Berg*, 5 Cal. App. 4th 34, 57 (1992), (holding that the third-party litigation rule "was not intended to apply to one of several joint tortfeasors in order to justify additional attorney's fee damages"). He asserts that because much or all the attorney fees sought by AA were expended on claims against joint tortfeasors or claims against himself, attorney fee damages cannot be awarded.

In order to evaluate Sloan's argument, the court must first determine the proper scope of attorney fees that may be awarded for AA's tortious interference with contract claim. In this

extensive litigation, AA had to pay its lawyers to defend itself against claims brought by ARS, to assert multiple counterclaims against ARS, and to assert claims against several other parties. In cases involving damages under the third-party litigation rule,

> care must be taken . . . to ensure not only that the attorney fees are otherwise properly calculated, but also that an allocation is made between recoverable fees incurred in litigation with third parties and non-recoverable fees incurred in pursuing the negligent defendant or expended on causes of action not proximately necessitated by that defendant's negligence.

*S. Sanpitch Co. v. Pack*, 765 P.2d 1279, 1283 (Utah Ct. App. 1988) (citation omitted). Thus, assuming that AA prevails at trial on its tortious interference with contract claim, the court must decide which legal claims asserted by AA were proximately caused by Sloan's interference with the licensing agreement. The court must then make an allocation between recoverable fees and nonrecoverable fees.

Although AA proposed five separate theories of tortious interference through improper means, the court has granted summary judgment on all these theories, save one. AA's remaining theory is that Sloan breached a duty to disclose the right of first refusal clause to Klinger and Rainho. AA argues that Sloan's wrongful conduct caused the merger of ARS with Fidelis/Kinum without notifying AA, which breached the right of first refusal. Thus, AA may argue at trial that Sloan's unlawful conduct required AA to sue ARS and its successor, Fidelis/Kinum, for breach of the right of first refusal clause. Any award of attorney fees as consequential damages must be

limited to fees allocated to AA's contract claim against ARS or Fidelis/Kinum for breach of this provision of the licensing agreement. [5]

Because AA may recover only fees attributable to this breach of contract claim against ARS and its successors, Sloan's argument that the court may not award fees for pursuing claims against joint tortfeasors is not relevant. Therefore, the court rejects it.

Next Sloan argues that attorney fee damages are not appropriate in this case because Sloan's conduct was not the initial cause of AA's counterclaims against ARS. *See  Webb v. Fin. Indus. Regulatory Auth., Inc.*, 889 F.3d 853, 858 (7th Cir. 2018) ("Illinois courts have not applied the exception when the defendant caused the legal fees to increase in an already existing third-party suit; they have applied it when the defendant caused the third-party suit in the first place."). AA asserted counterclaims against ARS before it even knew about Sloan or the sale of ARS to Fidelis. Sloan contends that because AA was able to add a counterclaim against ARS for breach of the right of first refusal only after it had already commenced litigation against it, Sloan should not be liable for attorney fees because he did not cause the initial litigation against ARS.

The court disagrees. The mere happenstance that AA had already asserted claims against ARS would not excuse it from liability for attorney fees expended on an additional claim that AA was forced to assert against ARS to vindicate its rights under the license agreement. In *South Sanpitch*, the plaintiff sued the defendant title company for negligently failing to promptly record a deed of partial reconveyance. 765 P.2d at 1280. As part of the same action, the plaintiff also asserted a third-party claim to quiet title to the affected parcel of property. *Id.* The plaintiff sought

---

[5] As noted above, though, the court has invited further briefing on AA's fraudulent nondisclosure theory of improper means. If the court grants summary judgment on this theory, the attorney fee issue would become moot.

attorney fees expended on the third-party claim as damages in its claim against the defendant. *Id.* at 1282. The Utah Court of Appeals held that the fact that the claim against the defendant for attorney fees and the claim against the third party to quiet title were joined together in the same action did not bar recovery of fees. *Id.* at 1283. So long as the court allocates fees between the recoverable and nonrecoverable segments of the litigation, the plaintiff may recover its fees in pursuing the third-party claim. *Id.* Here too, careful allocation between recoverable claims and nonrecoverable claims will adequately resolve any issues caused by the fact that AA had asserted other claims against ARS before it could sue it for breach of the right of first refusal.

In short, because the court must allocate fees for recoverable and nonrecoverable claims, the court rejects Sloan's arguments. Accordingly, the court denies summary judgment on AA's claim for attorney fees as consequential damages.

## CONCLUSION

For the reasons stated above, the court GRANTS IN PART and DENIES IN PART Sloan's motion for summary judgment and rules as follows:

1) The court grants summary judgment on AA's theories of improper means based on fraudulent misrepresentation, violations of Rule 11 and the Utah Rules of Professional Conduct, wrongful use of civil proceedings, and abuse of process.

2) The court denies without prejudice summary judgment on AA's theory of improper means based on Sloan's fraudulent nondisclosure of the right of first refusal. Sloan may file an additional motion for summary judgment raising other arguments regarding the fraudulent nondisclosure theory by January 11, 2021. AA may file a response brief by February 8, 2021. Sloan may reply by February 22, 2021.

3)  The court denies summary judgment on AA's claim for attorney fees as consequential

damages.

DATED November 30, 2020.

BY THE COURT

Jill N. Parrish
United States District Court Judge